OAK HILL FINANCE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 90121. Filed May 28, 1963

*Richard Katcher*, for the petitioner.
*William O. Allen*, for the respondent.

WITHEY, *Judge:* The respondent determined deficiencies in petitioner's income tax and additions to tax as follows:

| Year ended June 30— | Deficiency | Addition to tax—Sec. 291(a), I.R.C. 1939 |
|---|---|---|
| 1953 | $22,927.21 | $5,731.80 |
| 1954 | 23,058.58 | 5,764.65 |
| 1955 | 23,819.90 | |
| 1956 | 20,092.53 | |
| 1957 | 19,984.30 | |
| 1958 | 15,565.70 | |

The issues presented for our decision are (1) whether petitioner was a personal holding company within the meaning of section 501(a) of the Internal Revenue Code of 1939 and section 542(a) of the Internal Revenue Code of 1954 during its fiscal years ended June 30, 1953 through 1958; (2) in the event we hold that petitioner is a personal holding company under issue 1, whether the respondent is barred from assessing deficiencies in petitioner's personal holding company tax for its fiscal years ended June 30, 1955, 1956, and 1957, because of the expiration of the statute of limitations; and (3) whether petitioner was entitled to deduct interest in the amount of $4,806 for each of its fiscal years ended June 30, 1953 through 1958.

### GENERAL FINDINGS OF FACT

The stipulated facts are found as stipulated.

Petitioner is a corporation organized under the laws of West Virginia as a licensed personal finance company with its principal place of business located at Oak Hill, W. Va. At all times here material petitioner has been in the business of making personal loans.

Petitioner's income tax returns for each of its fiscal years ended June 30, 1951 through 1958, were filed with the director at Parkersburg, W. Va.

*Issue 1. Personal Holding Company*

### FINDINGS OF FACT

At all times here material the outstanding stock of petitioner was owned by R. C. Marshall, an individual, and Grable Finance Co. R. C. Marshall owned 37.08 percent of the value of petitioner's outstanding stock and Grable Finance Co. owned 62.92 percent in value thereof.

Grable Finance Co. (sometimes hereinafter referred to as Grable) is a corporation organized under the laws of Ohio with its principal place of business located at Cleveland, Ohio. Grable was engaged primarily in the personal finance business. From July 1, 1952, to January 7, 1957, its outstanding common stock was owned as follows:

| Stockholder: | Number of shares |
|---|---|
| Gertrude Grable | 665 |
| Gretchen Greiner (daughter of Gertrude Grable) | 548 |
| Mabel Codling (sister of Gertrude Grable) | 40 |
| Total shares outstanding | 1,253 |

On January 7, 1957, Gertrude Grable transferred 117 shares of capital stock to herself as trustee for the benefit of Gretchen Greiner and her children. From January 7, 1957, through June 30, 1958, the outstanding stock of Grable was owned as follows:

| Stockholder: | Number of shares |
|---|---|
| Gertrude Grable | 548 |
| Gertrude Grable, Trustee | 117 |
| Gretchen Greiner | 548 |
| Mabel Codling | 40 |
| Total shares outstanding | 1,253 |

From July 1, 1952, to June 25, 1957, the preferred stock of Grable Finance Co. was owned as follows:

| Stockholder: | Number of shares |
|---|---|
| Bessie Frost | 303 |
| Gertrude Grable | 69 |
| Total shares outstanding | 372 |

On June 25, 1957, the 303 shares owned by Bessie Frost were redeemed by Grable and on October 1, 1957, it redeemed the 69 preferred shares owned by Gertrude Grable.

The directors of petitioner and Grable Finance Co. throughout the years 1953 through 1958 were Gertrude Grable, Gretchen Greiner, R. C. Marshall, Mabel Codling, and Joseph C. Greiner, Jr. (the husband of Gretchen Greiner).

Since 1939 Grable Finance Co. has had a line of credit with Society National Bank of Cleveland, Ohio (sometimes hereinafter referred to as Society). During the period 1939 through 1948 the funds borrowed by Grable from Society were in turn loaned to petitioner and Mullens Finance Co. of Mullens, W. Va., for use by them as working capital in the conduct of their finance businesses. Mullens Finance Co. was owned by R. C. Marshall, Gertrude Grable, and Gretchen Greiner.

The procedure customarily followed by Grable, petitioner, and Mullens in transferring the funds borrowed from Society was as follows: As collateral security for its indebtedness to Society, Grable pledged certain promissory notes which it had received from petitioner and Mullens as evidence of their obligations to Grable for the funds it had loaned to them. In addition, Grable also pledged with Society the promissory notes and the deeds of trust which had been executed by individual borrowers from Mullens and petitioner and thereafter transferred by them to Grable. The individual notes and deeds of trust obtained by petitioner and Mullens from their borrowers were listed, scheduled, and assigned to Grable which in turn reassigned them to Society. Grable was required by Society to maintain records of payments made by borrowers from petitioner and Mullens which necessitated the transmittal to Grable of such records together with any paper received by Mullens and petitioner as pledges. Grable charged Mullens and petitioner interest on its loans to them at the same rate Grable was charged by Society.

The cumbersome procedures under which borrowed funds flowed from Society to Grable and then to petitioner and the necessary duplication and transmittal of records and the multiple assignment of legal obligations proved to be expensive and time consuming. Multiple bookkeeping entries and the execution of multiple promissory notes were required. Because of the time involved in the transmittal of records and the assignment and reassignment of the deeds of trust and promissory notes executed by borrowers from petitioner and Mullens, there was an inadequate control over the flow of borrowed funds, with the result that frequently money borrowed from Society on which interest was being paid would not arrive in the hands of the intended recipient until 1 or 2 months after it was originally borrowed from Society. Further, the banking department of the State of West Virginia raised frequent objections to the long delay involved in returning to petitioner's borrowers their canceled promissory notes and their released deeds of trust when their outstanding accounts were satisfied.

In an effort to dispense with the difficult and cumbersome procedures required by Grable Finance Co.'s arrangement with Society, petitioner attempted to borrow funds directly from other banks located in Ohio and West Virginia, but was unsuccessful. Thereafter, during the summer of 1948, petitioner contacted Society and requested a line of credit and a loan of funds directly to it in order to eliminate the extensive paperwork involved. Society, however, refused to lend funds directly to petitioner because of its policy of visiting and supervising small loan companies which had outstanding loan obligations to Society. Because of the distance of petitioner's office from Society, the officers of Society felt that the supervision of Oak Hill Finance

Co. would prove to be too costly. However, Society agreed to an arrangement under which it would transfer funds directly to petitioner on the condition that the Grable Finance Co. remain liable on the loans. Petitioner was willing to accept this arrangement because of its inability to secure financing from other sources. Pursuant to the arrangement suggested by Society, Grable Finance Co. executed an agreement on June 21, 1948, which, in pertinent part, is as follows:

WHEREAS, Oak Hill Finance Company (herein called "Oak Hill"), a West Virginia corporation, has applied to the Society for a line of credit under which it would borrow from time to time, which borrowings in some cases would be secured by the pledge and hypothecation of assets of Oak Hill and in other cases might not be so secured; and

WHEREAS, as a condition precedent to the Society granting any line of credit to Oak Hill and loaning money to it thereunder, the Society has required that all loans which may be made by it to Oak Hill be unconditionally and absolutely guaranteed by Grable; and

    \*       \*       \*       \*       \*       \*       \*

(2) Grable waives any notice of the acceptance of this Guaranty, waives any notice of the incurring of liabilities by Oak Hill to the Society, and waives any and all presentment, demand, protest, or notice of dishonor, nonpayment or other default with respect to any of the liabilities.

(3) Grable grants to the Society full power in its uncontrolled discretion and without notice to Grable, to do any or all of the following:

(a) Grant any extension or renewal of the liabilities and any other indulgences with respect thereto, and to effect any release, compromise or settlement with respect thereto;

(b) To forbear from calling upon Oak Hill for any collateral or security to secure the liabilities, either at the time of the incurring of the liabilities or thereafter; and

(c) To consent to, or permit, the substitution, exchange or release of all, or any part of any collateral or security which at any time may be mortgaged, pledged or hypothecated by Oak Hill, or by any other person or persons, to or with the Society, whether or not the collateral or security, if any, received by the Society upon any such substitution, exchange or release shall be of the same or of a different character or value from the collateral or security surrendered by it.

Grable shall have no rights of recourse against the Society nor shall its obligations to the Society under this Agreement, be impaired or affected in any way, by reason of any action the Society may take or fail or refuse to take under the foregoing powers.

(4) Grable agrees that in case Oak Hill shall fail to pay all or any part of the liabilities when the same may be due, whether at maturity, by acceleration or otherwise, Grable, within three (3) days after written demand therefor by the Society, shall pay the amount of the liabilities in full.

(5) Grable agrees that the Society shall not be required, as a condition to the enforcement of its obligations hereunder, to make any demand upon, or pursue or exhaust, any of its rights or remedies against Oak Hill or others, or to pursue or exhaust any of its rights or remedies with respect to any collateral or security which may have been mortgaged, pledged or hypothecated by Oak Hill or others to secure the liabilities, and Grable hereby waives and releases any rights of exoneration and any equity or right of marshalling which it otherwise might have.

(6) Grable hereby agrees to and with the Society that it shall have no right of subrogation whatsoever, with respect to the liabilities or any property which may be mortgaged, pledged or hypothecated as security therefor, unless and until Society shall have received payment in full of the liabilities.

During the period August 1, 1948, to June 30, 1958, it was the practice of petitioner to execute and deliver demand notes payable with interest at the rate of 6 percent per annum as evidence of loan obligations to Society. After September 1, 1957, such notes bore interest at the rate of 7 percent per annum.

Some of the funds which petitioner received from Society were in turn loaned to Mullens Finance Co., to O.K. Friend Finance Co., and also to the O.K. Friend Finance Co. of Nitro, W. Va., all of which were engaged in operating small loan companies and were licensed as such under the laws of West Virginia. These transactions were evidenced by demand notes issued to petitioner by such companies bearing interest at the rate of 6 percent per annum.

As a result of previous separate borrowings from Grable between 1948 and 1953, petitioner became indebted to it in the aggregate amount of $29,000 plus interest at the rate of 6 percent per annum. This obligation was repaid in full by petitioner during its fiscal year ended June 30, 1953, out of funds received from Society National Bank.

During 1952 Grable opened a new loan office in Cleveland, Ohio. In order to provide Grable with sufficient funds to operate its new loan office, petitioner made a series of advances totaling $26,000 during its fiscal year ended June 30, 1954, in addition to the $29,000 payment made during its previous fiscal year in discharge of its debt, thereby making available to Grable a total of $55,000 in operating funds. The advances made by petitioner to Grable during its fiscal year ended June 30, 1954, were evidenced by demand notes issued by Grable bearing interest at 6 percent per annum.[1]

As of the end of petitioner's fiscal years ended June 30, 1953 through 1958, the following balances were recorded on its books representing notes receivable from Grable Finance Co.:

Year ended June 30—

| | |
|---|---|
| 1953 | $10,000 |
| 1954 | 26,000 |
| 1955 | 25,000 |
| 1956 | 25,000 |
| 1957 | 33,500 |
| 1958 | 19,500 |

The gross income of petitioner for each of its fiscal years ended June 30, 1953 through 1958, was as follows:

[1] The only variation in the 6-percent interest rate was represented by one note issued on or about June 29, 1957, in the principal amount of $7,500, which bore interest at 8 percent.

Year ended June 30—
| | |
|---|---|
| 1953 | $100,495.46 |
| 1954 | 92,115.96 |
| 1955 | 89,292.64 |
| 1956 | 94,483.00 |
| 1957 | 95,421.00 |
| 1958 | 91,790.00 |

The source of the funds transferred by petitioner to Grable during its fiscal years ended June 30, 1953 and 1954, was money borrowed from Society National Bank.[2] The net income of petitioner for its fiscal years ended June 30, 1953 and 1954, was $14,030.16 and $14,661.62, respectively. The minutes of the meeting of the executive committee of Society National Bank held June 22, 1948, state as follows:

On the $200,000 secured line of credit to Grable Finance Company, interest rate 6%, the Committee authorized renewal for one year from July 1, 1948, and consented that the credit be available to a subsidiary company, Oakhill Finance Company, the notes however to be guaranteed by the parent company.

The collateral control card of Society National Bank containing the record of payment and the loan balances on the $200,000 open line of credit which subsequent to June 22, 1948, was drawn upon by petitioner contains the following caption:

Borrower   Grable Finance Company   Collateral Control Card   Loan No. T 1099
Address     (Oak Hill Finance)
Collateral Control   70%                                    Amount authorized $200,000

At all times here material Grable Finance Co. was the principal debtor on the open line of credit made available by Society National Bank, although after June 21, 1948, the funds borrowed by Grable were paid directly to Oak Hill Finance Co. and deposited by it in its own bank account. None of the transfers of funds made by petitioner to Grable during 1953 and 1954 constituted loans to it.

OPINION

The respondent has taken the position that during the years 1953 through 1958 petitioner was a personal holding company within the meaning of section 501(a) of the 1939 Code[3] and section 542(a) of

---

[2] With the exception of $7,500 which was borrowed by petitioner from Elizabeth Dixon.

[3] SEC. 501. [I.R.C. 1939]   DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For the purposes of this subchapter and chapter 1, the term "personal holding company" means any corporation if—

(1) GROSS INCOME REQUIREMENT.—At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 502; but if the corporation is a personal holding company with respect to any taxable year beginning after December 31, 1936, then, for each subsequent taxable year, the minimum percentage shall be 70 per centum in lieu of 80 per centum, until a taxable year during the whole of the last half of which the stock ownership required by paragraph (2) does not exist, or until the expiration of three consecutive taxable years in each of which less than 70 per centum of the gross income is personal holding company income; and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.

the 1954 Code [4] and was therefore liable for personal holding company surtax imposed by section 500 of the 1939 Code and section 541 of the 1954 Code.

The petitioner concedes that at least 80 percent of its gross income for each of the years in issue was personal holding company income as defined by section 502 of the 1939 Code and section 543 of the 1954 Code and that during the last half of each year more than 50 percent in value of its outstanding stock was owned by not more than five individuals. It contends, however, that during the years here involved it qualified as a licensed personal finance company under section 501(b)(6)(A) of the 1939 Code and section 542(c)(6) of the 1954 Code which exclude corporations so qualifying from the definition of a personal holding company.

The parties have stipulated that during the years 1953 through 1958, inclusive, petitioner was a licensed personal finance company operating under State supervision and that at least 80 percent of its gross income consisted of lawful interest "received from loans made to individuals in accordance with the provisions of applicable State law." They also agree that during each of the years in question at least 60 percent of petitioner's gross income consisted of lawful interest received from individuals whose indebtedness to it did not at any time exceed in principal amount the limit prescribed for small loans by State law. The parties have further stipulated that at least 60 percent of petitioner's gross income for each year in issue was interest which was not payable in advance or compounded, and which was computed only on unpaid balances.

The sole point of disagreement relates to the latter part of the second subdivisions of section 501(b)(6)(A) of the 1939 Code and section 542(c)(6) of the 1954 Code, which prescribe a dollar limitation on loans to owners of 10 percent or more in value of the corporation's outstanding stock.

The petitioner contends that this restriction simply means that none of the interest governed by the 60-percent limitation (i.e., not more than 40 percent of the corporation's gross income) can be derived from loans of more than $5,000 to a shareholder owning 10 percent or more of the outstanding stock if the corporation is to qualify as a licensed personal finance company under section 501(b)(6)(A) and section 542(c)(6).

---

[4] SEC. 542. [I.R.C. 1954] DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For purposes of this subtitle, the term "personal holding company" means any corporation (other than a corporation described in subsection (c)) if—

(1) GROSS INCOME REQUIREMENT.—At least 80 percent of its gross income for the taxable year is personal holding company income as defined in section 543, and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals. * * *

Under such a construction of the statute, petitioner satisfied all of the tests laid down in section 501(b) (6) (A) and section 542(c) (6) inasmuch as the parties have stipulated that three of the tests are satisfied and any loans which were made by petitioner during the years in issue to Grable Finance Co. (which owned 62.92 percent in value of petitioner's stock at all times here material) were always less than 40 percent of its gross income.[5]

The respondent claims that if the corporation has made any loan of more than $5,000 to a 10-percent stockholder, it cannot qualify as a licensed personal finance company under the above-stated exception. The respondent further contends that the notes-receivable balances recorded on petitioner's books represented actual loans made by it to Grable Finance Co.

The pertinent parts of section 501(b) (6) (A) of the 1939 Code and section 542(c) (6) of the 1954 Code read as follows:

SEC. 501. [I.R.C. 1939] DEFINITION OF PERSONAL HOLDING COMPANY.
(b) EXCEPTIONS.—The term "personal holding company" does not include—

\* \* \* \* \* \* \*

(6) (A) A licensed personal finance company under State supervision, 80 per centum or more of the gross income of which is lawful interest received from loans made to individuals in accordance with the provisions of applicable State law if at least 60 per centum of such gross income is lawful interest (i) received from individuals each of whose indebtedness to such company did not at any time during the taxable year exceed in principal amount the limit prescribed for small loans by such law (or, if there is no such limit, $500), and (ii) not payable in advance or compounded and computed only on unpaid balances, and if the loans to a person, who is a shareholder in such company during the taxable year by or for whom 10 per centum or more in value of its outstanding stock is owned directly or indirectly (including in the case of an individual, stock owned by the members of his family as defined in section 503 (a) (2)), outstanding at any time during such year do not exceed $5,000 in principal amount; \* \* \*

SEC. 542. [I.R.C. 1954] DEFINITION OF PERSONAL HOLDING COMPANY.
(c) EXCEPTIONS.—The term "personal holding company" as defined in subsection (a) does not include—

\* \* \* \* \* \* \*

[5] The notes-receivable balances recorded on petitioner's books representing notes receivable from Grable Finance Co. as of the end of each of the fiscal years ended June 30, 1953 through 1958, and 40 percent of the petitioner's gross income for each of those years, were as follows:

| Year ended June 30— | Notes receivable outstanding | 40 percent of gross income |
|---|---|---|
| 1953 | $10,000 | $40,198 |
| 1954 | 26,000 | 36,846 |
| 1955 | 25,000 | 35,717 |
| 1956 | 25,000 | 37,793 |
| 1957 | 33,500 | 38,168 |
| 1958 | 19,500 | 36,616 |

(6) a licensed personal finance company under State supervision, 80 percent or more of the gross income of which is lawful interest received from loans made to individuals in accordance with the provisions of applicable State law if at least 60 percent of such gross income is lawful interest—

(A) received from individuals each of whose indebtedness to such company did not at any time during the taxable year exceed in principal amount the limit prescribed for small loans by such law (or, if there is no such limit, $500), and

(B) not payable in advance or compounded and computed only on unpaid balances, and if the loans to a person, who is a shareholder in such company during the taxable year by or for whom 10 percent or more in value of its outstanding stock is owned directly or indirectly (including, in the case of an individual, stock owned by the members of his family as defined in section 544(a)(2)), outstanding at any time during such year do not exceed $5,000 in principal amount;

The structure of subsection (b)(6)(A) of section 501 of the 1939 Code and subsection (c)(6) of section 542 of the 1954 Code divides these subsections into two subdivisions immediately following the words "if at least 60 percent of such gross income is lawful interests," which would tend to suggest that only 60 percent of the corporation's gross income must not have been derived from loans of more than $5,000 to a 10-percent stockholder thereof. However, the words "and if" which follow the words "if at least 60 percent of such gross income is lawful interest," and which immediately precede the dollar limitation on loans made to substantial stockholders, indicate that this particular limitation was intended to disqualify as a licensed personal finance company a corporation which makes *any* such loan in excess of $5,000. This, in our opinion, is the correct reading of the statute. Such a view of the applicability of this exception to the definition of a personal holding company appears to be supported by the statement of the House Ways and Means Committee in its report accompanying the enactment of this subsection in the Act of August 9, 1950, 56 Stat. 894:

The bill would amend section 501(b)(6) of the Code as follows:

\*          \*          \*          \*          \*          \*          \*

4. It would also add the further requirement that loans outstanding at any time during the taxable year to a person who is a shareholder in a personal finance company during the taxable year, by or for whom 10 percent or more in the value of its outstanding stock is owned directly or indirectly, shall not exceed $5,000 in principal amount. This test would correspond with that prescribed with respect to a loan or investment corporation which is excepted from the definition of personal holding company under section 501(b)(7). [H. Rept. No. 1434, 81st Cong., 1st Sess., p. 2 (1949).]

Therefore, from a careful reading of the language of the statute and the foregoing congressional committee report, it clearly appears that by the enactment of the dollar limitation in question on loans to significant stockholders, Congress intended to create a separate criterion which would altogether disqualify as a licensed personal finance com-

pany a corporation which made any loan exceeding $5,000 to a shareholder owning 10 percent or more of its stock, rather than merely to set up a restrictive standard relating to the sources of only 60 percent of its interest income.

The underlying purpose of this dollar limitation on loans to substantial stockholders of a corporation which might otherwise qualify as a licensed personal finance company under the subsections in question is explained by the report of the House Ways and Means Committee relating to the enactment of the loan or investment corporation exception under section 501(b)(7) of the 1939 Code:

The possibility that a stockholder may avoid individual surtaxes by obtaining a substantial loan from the company and deducting the interest paid thereon is practically eliminated by the limitation on loans imposed by State law and is effectively prevented by the limitation incorporated in the provision granting exemption. [H. Rept. No. 2333, 77th Cong., 1st Sess. (1942), 1942-2 C.B. 472.]

Under the construction we here adopt of section 501(b)(6)(A) of the 1939 Code and section 542(c)(6) of the 1954 Code, a corporation can qualify as a licensed personal finance company if—

(1) Only 60 percent of its gross income qualifies under the following specific tests:

(a) It has been received from persons whose indebtedness to the company was within the limitation prescribed by State law for small loans;

(b) It was not payable in advance or compounded;

(c) It was computed only on unpaid balances; *and*

(2) It has not made any loan of more than $5,000 to a 10-percent stockholder.

Applying these subsections to the record, we are presented with this question: Did Oak Hill Finance Co. lend to its parent, Grable Finance Co., more than $5,000 during any of the years here in issue?

The resolution of this question depends upon whether the outstanding notes receivable by petitioner during the years here involved represent genuine loans on its part and bona fide indebtedness on the part of Grable or whether they in fact merely represent intercompany transfers of funds to Grable which it had borrowed from Society and had directed Oak Hill to receive and deposit in its own bank account.

It is clear from the record that the source of the funds transferred by petitioner to Grable during the period June 30, 1953, through June 30, 1958, was money which previously had been borrowed from Society and was either transmitted directly to Oak Hill or, if borrowed prior to June 21, 1948, had been paid by Society to Grable which in turn loaned it to petitioner.

The testimony of George G. Litzko, vice president of Society National Bank, shows clearly that Society always intended to extend its credit solely to Grable and regarded it as the primary obligor on

the open line of credit. He was the principal loan officer of Society and had dealt with Grable Finance Co. since 1939. On direct examination, he testified as follows:

Q. Which company, Mr. Litzko, did you consider as being the borrower of funds even after 1948, Grable Finance Company or Oak Hill?

A. As far as we were concerned, speaking for the bank, myself, it was Grable Finance Company that was doing it. That's the reason we made these advances.

The collateral control card maintained by Society during the years 1956 through 1961 contains the record of payments made on the line of credit available from Society and specifically names Grable Finance Co. as the borrower. On cross-examination, George Litzko explained the collateral control card as follows:

Q. Isn't it likely, Mr. Litzko, that these collateral control cards represent a mere continuation of the collateral loan carried originally in existence for the loan to Grable Finance Company?

A. As a loaning officer I considered this a Grable loan and we kept them on there to keep the name of Grable. That's who we were dealing with, the Grable people as such.

The minutes of the meeting of the executive committee of Society also indicate that its extension of credit was made to Grable Finance Co.

On June 21, 1948, the procedures followed under Society's original loan to Grable were rearranged so as to cause the loan proceeds to flow directly to petitioner. An agreement was executed on that date by Grable Finance Co. under which it agreed that in the event that Oak Hill failed to repay when due any of the funds it received from Society, upon 3 days' written notice, Grable would make payment in full. Although this contract bears the title of "GUARANTY AGREEMENT," it does not require Society to pursue its legal remedies against Oak Hill in order to fix Grable's liability for repayment. Grable's liability to repay the funds borrowed from Society was to become fixed upon 3 days' written notice from Society, or practically immediately. Consequently, as we view the substance of the so-called "GUARANTY AGREEMENT" of June 21, 1948, its entire purpose and effect were to impose upon Grable primary liability for repayment of the line of credit extended by Society.

The series of payments made by Oak Hill to Grable during 1953 and 1954 appear to have been made by petitioner as the agent of Grable or as a mere conduit through which the flow of borrowed funds was channeled. Despite the facts that these advances were evidenced by demand notes bearing 6-percent interest, that they were recorded on petitioner's books as "notes receivable outstanding," and that the minutes of a meeting of Grable's directors on August 6, 1957, describe one of the cash advances as having been "borrowed" from Oak Hill,

these formalities appear to lack any underlying substance. During the years in issue and in fact throughout its corporate existence, Oak Hill Finance Co. was always controlled by its parent, Grable, which owned 62.92 percent of its outstanding stock. The directors of petitioner and the directors of Grable were the same individuals throughout the years 1953 to 1958. We are unable to find from the record that any of the interest called for by the demand notes which evidenced the intercompany transfer of borrowed funds was ever paid to petitioner. For the above-stated reasons we hold that the funds transferred by petitioner to Grable Finance Co. during the years here in issue did not represent bona fide loans to Grable and, further, that petitioner did not make any loans to a stockholder who held more than 10 percent in value of its outstanding stock at any time during the years 1953 through 1958. Therefore, in our opinion, petitioner constituted a "licensed personal finance company" within the meaning of section 501(b)(6)(A) and section 542(c)(6) of the 1939 and 1954 Codes, respectively, throughout the years involved and was not a personal holding company under section 501(a) of the 1939 Code and section 542(a) of the 1954 Code during any of the years in issue.

In an amendment to its petition, petitioner claims that the respondent is barred by the expiration of the 3-year period of limitations on assessment provided in section 6501(a) of the 1954 Code from determining deficiencies in its personal holding company surtax for its fiscal years ended June 30, 1955, 1956, and 1957. On brief, petitioner contends that in the event we hold that petitioner was a personal holding company during the years in issue, the respondent is barred by the expiration of the 3-year statute of limitations from determining deficiencies in its personal holding company tax for its fiscal years ended June 30, 1955 and 1957.

Inasmuch as we have held that petitioner did not constitute a personal holding company within the meaning of section 501(b)(6) of the 1939 Code and section 542(c)(6) of the 1954 Code, this issue is no longer before us for decision.

*Issue 2. Interest Deduction*

FINDINGS OF FACT

During the period of 1941 to 1958, petitioner had on a number of occasions borrowed funds from individuals for use in the operation of its finance business.

Prior to September 29, 1952, R. C. Marshall and Kathleen Marshall, Gertrude Grable, Gretchen Greiner, Joseph C. Griener III, and Gretchen Merry Greiner loaned funds to petitioner in the total amount

of $40,050.[6]   The amount of the loan made by each of the above-mentioned individuals was as follows:

| Lender: | Amount |
|---|---|
| R. C. and Kathleen Marshall | $15,100 |
| Gertrude Grable | 7,950 |
| Gretchen Greiner | 1,000 |
| Joseph C. Greiner III | 8,000 |
| Gretchen Merry Greiner | 8,000 |
| | 40,050 |

Each of these loans was evidenced by a promissory note payable on demand and bearing interest at the rate of 6 percent per annum.

During 1952 petitioner requested Society National Bank to increase to $200,000 the $150,000 line of credit then available to it.   Society agreed to such an increase in the line of credit it would make available to petitioner on the credit of Grable on the condition that the six above-mentioned individuals who had loaned petitioner a total of $40,050 would consent to subordinate their indebtedness to any future loans made by Society.   Society held as collateral certain promissory notes pledged by petitioner as well as a "GUARANTY AGREEMENT" executed by Grable Finance Co.

For the purpose of enabling petitioner through Grable's credit to obtain an increase in working capital, R. C. Marshall, Kathleen Marshall, Gertrude Grable, Gretchen Greiner, and Joseph C. Greiner, Jr., trustee for Joseph C. Greiner III and Gretchen Merry Greiner, all agreed to subordinate their outstanding notes to the loans made by Society provided the interest paid to them was increased from 6 percent per annum to 12 percent per annum.   The interest rate of 12 percent which was paid by petitioner to these noteholders was an unlawful rate of interest under the laws of both West Virginia and Ohio.

On June 2, 1952, the noteholders executed a subordination agreement with Oak Hill Finance Co. in which they agreed that in consideration of continued loans being made to it by Society National Bank they would refrain from demanding any part of the principal amount of their indebtedness until all outstanding Society loans were repaid in full.

On September 29, 1952, the directors of Oak Hill Finance Co. unanimously adopted a resolution which stated, in pertinent part, as follows:

RESOLVED: That in lieu of an agreement between, Russell and Kathleen Marshall, Gertrude Grable, Gretchen Greiner and Jos. C. Greiner, Jr. as trustee for minor children, Jos. C. Greiner, III and Gretchen Merry Greiner, whereby they agree to leave an aggregate total of $40,050.00, represented by individual notes, as permanent working capital for the Company, that the interest rate on

---

[6] The record does not clearly disclose the date on which these loans were made. However, the record indicates that five promissory notes dated May 1, 1952, were received by the above-mentioned individuals as evidence of their loans.

these certain notes be increased from six (6%) per cent to twelve (12%) per cent, to compensate them in some part for relinquishing their privilege to reduce their Demand Notes. Agreement retroactive to July 1st, 1952.

From July 1, 1952, through June 30, 1958, the books and records of petitioner at all times reflect a total liability of $40,050 to the above-mentioned noteholders. From July 1, 1952, through June 30, 1958, petitioner consistently paid to each of them when due an amount equal to 12 percent of the face amounts of their demand notes.

No part of the principal amounts of any of the notes was ever repaid to the holders thereof.

On each of the income tax returns for its fiscal years ended June 30, 1953 through 1958, petitioner deducted $4,806 representing total interest payments made to the noteholders each year in an amount equal to 12 percent of the face amounts of their demand notes.

The respondent disallowed in full the foregoing deduction claimed by petitioner as interest on its returns for the years in question.

### ULTIMATE FINDING

The promissory notes totaling $40,050 executed by petitioner to the above-mentioned noteholders did not represent bona fide indebtedness during the years in issue and the $4,806 amount paid to them each year did not constitute interest.

### OPINION

The respondent has determined that the amounts advanced by the six noteholders to Oak Hill Finance Co. prior to September 29, 1952, were converted by them into capital contributions, and that the annual payments of $4,806 made to them by petitioner during each of the years in question do not constitute interest deductible under section 23(b) of the 1939 Code [7] nor section 163(a) of the 1954 Code.[8]

Petitioner has taken the position that the aforementioned advances constituted a bona fide indebtedness throughout all of the years in issue and that the annual payments made to the noteholders represented deductible interest.

The parties have stipulated that in return for the advances totaling $40,050 petitioner issued its "demand notes * * * bearing interest at 6% per annum" to each of the individuals who advanced funds.

---

[7] SEC. 23. [I.R.C. 1939] DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

(b) INTEREST.—All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this chapter.

[8] SEC. 163. [I.R.C. 1954] INTEREST.
(a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

The respondent does not suggest that the advances in question were other than genuine loans when originally made to the petitioner, but argues, rather, that at a meeting of the directors of petitioner on September 29, 1952, more than 3 months after the execution by petitioner and the six noteholders of a subordination agreement, they converted their loans into permanent working capital. In support of his contention the respondent relies in part on a resolution which was unanimously approved by the directors of petitioner on September 29, 1952, and which stated, in part, that the loans totaling $40,050 were to be left "as permanent working capital for the Company."

Respondent urges that in view of the subordination agreement executed by the noteholders and petitioner on June 2, 1952, in which they agreed to refrain from demanding any part of the principal amount of their debt until all the outstanding loans of Society were repaid in full, together with the above-quoted resolution adopted by petitioner's board of directors which described the advances as "permanent working capital for the Company" and the 12-percent rate of interest which thereafter was consistently paid to the noteholders, plus the fact that the entire $40,050 advanced by them was left with the petitioner throughout the years 1953 through 1958 and has never since been reduced, their promissory notes in fact represented an equity interest in the corporation resembling preferred stock. We agree with the respondent's contention.

With respect to the resolution adopted by the directors of Oak Hill Finance Co. describing the advances in question as "permanent working capital," R. C. Marshall, Gertrude Grable, Gretchen Greiner, and Joseph Greiner, Jr., trustee for two minor children, Joseph Greiner III and Gretchen Merry Greiner, each of whom advanced a part of the funds here in issue to petitioner, were also members of its board of directors and were present at the meeting held on September 29, 1952. R. C. Marshall, Gertrude Grable, and Gretchen Greiner each claimed at the trial that there was no discussion at that meeting concerning the possibility of the $40,050 advances being left with the company as permanent working capital, that the phrase "permanent working capital" was language selected solely by the secretary of the board and did not accurately reflect the action of the directors, and that the noteholders have at all times regarded themselves as creditors of petitioner with the expectation of collecting the full face amounts of their notes.

Although petitioner strongly argues that the above-quoted statement appearing in the minutes of the Oak Hill directors meeting is incorrect, it at least suggests that the secretary of petitioner's board thought that at the time the subordination agreement was executed the loans of the six noteholders were converted into the working capital of the corporation. There is no indication that these minutes

were ever amended. In view of the circumstances under which the subordination contract was executed, it appears to us that petitioner's directors intended that their loans, at least for a few years, were to be made available to the corporation as working capital. Their subsequent actions are consistent with the proposition that the original loans have been converted to capital contributions.

Although the instruments themselves did not give the noteholders any voting rights in Oak Hill Finance Co., R. C. Marshall was a direct stockholder therein and five of the six noteholders were members of its board of directors and entitled to participate in its management. Further, Gertrude Grable was the controlling stockholder of the petitioner's parent, Grable Finance Co., and Gretchen Greiner and her two children, Joseph C. Greiner and Gretchen Merry Greiner, were all either direct or beneficial owners of Grable stock. We think it is also significant that the subordinated notes in question roughly approximated the percentage of stockownership in petitioner. R. C. Marshall, who owned 37.08 percent of petitioner's outstanding stock, held, together with his wife, approximately 38 percent of the subordinated promissory notes. The Grable family, which controlled petitioner's parent, Grable Finance Co., owned approximately 62 percent of the subordinated notes, while Grable owned 62.92 percent of petitioner's outstanding stock.

Although it is apparent that petitioner relied heavily upon borrowed funds for its working capital, it has failed to establish whether its capitalization was adequate. Cf. *Isidor Dobkin*, 15 T.C. 31 (1950), affd. 192 F. 2d 392 (C.A. 2, 1951) ; *Swoby Corporation*, 9 T.C. 887 (1947).

Society National Bank, although not a direct creditor of petitioner, held certain of its promissory notes as pledged collateral for the open line of credit it had extended to Grable Finance Co. Petitioner at the direction of Grable drew heavily upon this line of credit for its working capital. The subordination agreement of June 2, 1952, provided that the six noteholders subordinate their indebtedness to the loans made by Society National Bank. It seems apparent to us that when the noteholders subordinated their loans to the claims of Society, they, in effect, placed their money at the risk of the business.

The rate of interest paid by petitioner, i.e., 12 percent per annum, was an unlawful rate under the laws of the State in which the notes were executed [9] and is further evidence of an equity investment in the corporation.

---

[9] It is not clear from the record whether the notes in question were executed in West Virginia or Ohio. Under Ohio law the maximum lawful rate of interest chargeable on a promissory note is 8 percent per annum. Ohio Rev. Code Ann., sec. 1343.01 (Page 1962). Under the laws of West Virginia, the maximum legal interest rate on such a note is 6 percent per annum. W. Va. Code Ann., sec. 4627 (1961).

For the foregoing reasons we are of the opinion that the notes in question totaling $40,050 were, in effect, converted into working capital by the holders thereof not later than September 29, 1952, and did not thereafter constitute indebtedness of the petitioner. We therefore hold that the $4,806 amount paid to the noteholders did not represent interest within the meaning of sections 23 and 163(a) of the 1939 and 1954 Codes, respectively, and is not deductible by it for any of the years in issue. Cf. *United States* v. *South Georgia Ry. Co.*, 107 F. 2d 3 (C.A. 5, 1939); *Jewel Tea Co.* v. *United States*, 90 F. 2d 451 (C.A. 2, 1937).

*Decision will be entered under Rule 50.*

