JAMES PETERS AND LOLA PETERS, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 17558–79—17560–79.     Filed November 30, 1981.

---

[4]See also *Corn Belt Hatcheries of Arkansas, Inc. v. Commissioner,* 52 T.C. 636 (1969).

[1]Cases of the following petitioners are consolidated herewith: James C. Spaulding and Judy D. Spaulding, docket No. 17559–79; and Carl Schiffer and Elma Schiffer, docket No. 17560–79.

*Edward J. Essay, Jr.*, for the petitioners.
*Thomas G. Hodel*, for the respondent.

NIMS, *Judge*: Respondent determined deficiencies in, petitioners' income tax as follows:

|  | Year | Deficiency |
|---|---|---|
| Docket No. 17558–79 | 1976 | $20,146 |
|  | 1977 | 7,059 |
| Docket No. 17559–79 | 1976 | 12,381 |
|  | 1977 | 7,419 |
| Docket No. 17560–79 | 1977 | 7,448 |

The issue for decision is whether, under section 465,[2] the borrowing of funds from a related "person" within the meaning of section 267(b) limits petitioners' otherwise deductible partnership losses.

## FINDINGS OF FACT

At the time the petitions in this case were filed, all of the petitioners resided in Colorado.

Ordway Feed, Inc. (Feed), is a Colorado corporation organized on January 1, 1969; petitioners James Peters, James C. Spaulding, and Carl Schiffer (hereinafter petitioners) each owned one-third of Feed's stock during the years in issue. Feed is in the business of manufacturing and selling feed for livestock. Feed uses the accrual method of accounting for tax purposes.

Ordway Livestock Partnership (Livestock) was organized in August 1972, and was in the business of raising, feeding, caring for, and managing cattle. Each petitioner owned a one-third interest in Livestock and each actively participated in its operations. The only cattle raised and fed belonged to Livestock. It used the cash method of accounting.

Ordway Pork (Pork) is a second partnership owned by petitioners which bought livestock feed from Feed.

Shortly after Feed's formation, it established a line of credit with First National Bank of Pueblo, Pueblo, Colo. (bank). In

---

[2] All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise specifically indicated.

accordance with the bank's loan policy, the loans to Feed were conditioned upon the petitioners' personal guaranty. On or about January 8, 1969, each petitioner executed a guaranty agreement wherein they jointly and severally guaranteed all sums of money lent by the bank to Feed. Petitioners signed no other guaranty agreement with any lending institution.

Subsequent to January 1969, the bank made periodic loans to Feed. Certain debts which Feed owed to petitioners were subordinated to these bank loans. The bank's loans to Feed were paid off in March 1979.

Prior to and during 1976, Livestock borrowed substantial amounts of money directly from the bank. All of these loans were completely paid back by December 6, 1976. On December 30, 1976, Livestock obtained a $144,674.85 loan from Feed, and on the same day, paid Feed $144,674.85 for cattle feed which Livestock had previously purchased from Feed on credit. These transactions were consummated by an exchange between the two entities of checks in identical amounts. On July 20, 1977, the 1976 loan was further formalized by a 1-year promissory note from Livestock to Feed in the $144,674.85 amount, bearing interest from that date to maturity at 7 percent per annum. The $144,674.85 payment by Livestock in December 1976, generated the bulk of its loss for 1976.

Sometime in 1977, Livestock obtained an additional loan, this time in the amount of $138,665.63. The record does not disclose the use to which the proceeds of the 1977 loan were put.

During the years 1972 to 1978, inclusive, Livestock sustained the following losses:

| | | | |
|---|---|---|---|
| 1972 | ($19,651) | 1976 | ($115,224) |
| 1973 | (100,326) | 1977 | (43,967) |
| 1974 | (152,333) | 1978 | (2,446) |
| 1975 | (38,400) | | |

The per partner share of the 1976 loss was $38,408 and the per partner share of the 1977 loss was $14,655.67. All of Livestock's inventory was sold during 1976. The total partnership assets at the end of 1976 and 1977 equaled $61,346 and $1,086, respectively. Livestock was dissolved subsequent to 1977.

The aggregate amounts of money which Feed and Livestock owed to various entities during the years 1972 to 1979, inclusive, are as shown on page 1161.

|  | FEED | | LIVESTOCK | | | |
| Taxable year ending | Notes (subordinate) payable to stockholders | Notes to banks | Notes to: Banks | Notes to: Partners | Notes to: Pork | Notes to: Feeds |
|---|---|---|---|---|---|---|
| 7/31/72 | $132,000 | $86,896 |  |  |  |  |
| 12/31/72 |  |  | $67,500 | $45,168 |  |  |
| 7/31/73 | 175,180 | 84,062 |  |  |  |  |
| 12/31/73 |  |  | 370,000 | 65,769 | $31,500 |  |
| 7/31/74 | 182,163 | 265,544 |  |  |  |  |
| 12/31/74 |  |  | 300,000 | 178,040 | 128,000 |  |
| 7/31/75 | 182,163 | 256,897 |  |  |  |  |
| 12/31/75 |  |  | 350,000 | 220,348 | 75,900 |  |
| 7/31/76 | 196,736 | 310,478 |  |  |  |  |
| 12/31/76 |  |  | 0 | 54,345 | 260,900 | $144,674.85 |
| 7/31/77 | 299,392 | 283,761 |  |  |  |  |
| 12/31/77 |  |  | 0 | 0 | 285,900 | [3] 283,340.48 |
| 7/31/78 | 299,392 | 191,765 |  |  |  |  |
| 12/31/78 |  |  | 0 | 300,000 | 126,432 | 0 |
| 4/30/79 | 207,373 | 10,000 |  |  |  |  |
| 12/31/79 |  |  |  | 224,458 | 126,432 | 0 |

## OPINION

During the taxable years at issue, petitioners James Peters, Carl Schiffer, and James Spaulding each held one-third of the shares of Feed, a Colorado corporation. They were also equal partners in Livestock, a partnership.

On December 30, 1976, by means of an exchange of checks in identical amounts—$144,674.85—Livestock received funds from Feed as the proceeds of a loan, and then paid these funds to Feed for cattle grain previously purchased on credit from Feed. This purchase created the bulk of a loss incurred by Livestock in 1976. Sometime during 1977, Livestock incurred an additional $138,665.63 indebtedness to Feed. The parties agree that these two borrowings created a genuine indebtedness from Livestock to Feed. Furthermore, they have proceeded upon the implicit assumption that deductions will be lost by petitioners, dollar-for-dollar to the extent, if any,

[3] The loan activity schedule which petitioners submitted listed this figure as $138,666. James W. Grimsley, C.P.A., the witness who prepared this schedule, stated that the schedule's amounts represented the aggregate balance due as of the end of each respective taxable year. Since there is no evidence in the record indicating any payment by Livestock on the 1976 loan from Feed, we have added the amount of the 1977 loan to the amount of the 1976 loan to arrive at the figure listed above.

that we find that the borrowings by Livestock from Feed were not at risk under section 465.[4] Accordingly, we accept that premise as setting the parameters of the issue to be decided.

---

[4]The provisions of sec. 465 in effect for the years 1976 and 1977, the years before the Court, read as follows:

SEC. 465. DEDUCTIONS LIMITED TO AMOUNT AT RISK IN CASE OF CERTAIN ACTIVITIES.—

(a) GENERAL RULE.—In the case of a taxpayer (other than a corporation which is neither an electing small business corporation (as defined in section 1371(b)) nor a personal holding company (as defined in section 542)) engaged in an activity to which this section applies, any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of subsection (b)) for such activity at the close of the taxable year. Any loss from such activity not allowed under this section for the taxable year shall be treated as a deduction allocable to such activity in the first succeeding taxable year.

(b) AMOUNTS CONSIDERED AT RISK.—

(1) IN GENERAL.—For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including—

(A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and

(B) amounts borrowed with respect to such activity (as determined under paragraph (2)).

(2) BORROWED AMOUNTS.—For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he—

(A) is personally liable for the repayment of such amounts; or

(B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property).

No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1).

(3) CERTAIN BORROWED AMOUNTS EXCLUDED.—For purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who—

(A) has an interest (other than an interest as a creditor) in such activity, or

(B) has a relationship to the taxpayer specified within any one of the paragraphs of section 267(b).

(4) EXCEPTION.—Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

(5) AMOUNTS AT RISK IN SUBSEQUENT YEARS.—If in any taxable year the taxpayer has a loss from an activity to which this section applies, the amount with respect to which a taxpayer is considered to be at risk (within the meaning of subsection (b)) in subsequent taxable years with respect to that activity shall be reduced by that portion of the loss which (after the application of subsection (a)) is allowable as a deduction.

(c) ACTIVITIES TO WHICH SECTION APPLIES.—

(1) TYPES OF ACTIVITIES.—This section applies to any taxpayer engaged in the activity of—

(A) holding, producing, or distributing motion picture films or video tapes,

(B) farming (as defined in section 464(e)),

(C) leasing any section 1245 property (as defined in section 1245(a)(3)), or

(D) exploring for, or exploiting, oil and gas resources as a trade or business or for the production of income.

Section 465 was added to the Code by Pub. L. 94–455, 90 Stat. 1531, the Tax Reform Act of 1976 (the 1976 Act) and substantially amended by Pub. L. 95–600, 92 Stat. 2814, the Revenue Act of 1978 (the 1978 Act). Further minor amendments, not here germane but cited for completeness, were made by Pub. L. 26–222, 94 Stat. 207, the Technical Corrections Act of 1979. We are here directly concerned only with the provisions added by the 1976 Act, although the 1978 Act and its legislative history cast some light on the scope of the original provisions of section 465.

We note initially that the Livestock partnership, and therefore each petitioner, is subject to the coverage of section 465. Partnerships are not excluded under section 465(a) as are "regular" corporations.[5]

Generally, section 465(a) imposes a limitation upon the deductibility of losses arising from any activity specified in section 465(c). This limitation is computed by reference to the "amounts considered at risk" under section 465(b).

One of the enumerated activities in section 465(c) is farming as defined in section 464(e), which definition includes "the raising, shearing, feeding, caring for, training, and manage-

---

(2) SEPARATE ACTIVITIES.—For purposes of this section, a taxpayer's activity with respect to each—

    (A) film or video tape,

    (B) section 1245 property which is leased or held for leasing,

    (C) farm, or

    (D) oil and gas property (as defined under section 614),

shall be treated as a separate activity. A partner's interest in a partnership or a shareholder's interest in an electing small business corporation shall be treated as a single activity to the extent that the partnership or an electing small business corporation is engaged in activities described in any subparagraph of this paragraph.

(d) DEFINITION OF LOSS.—For purposes of this section, the term "loss" means the excess of the deductions allowable under this chapter for the taxable year (determined without regard to this section) and allocable to an activity to which this section applies over the income received or accrued by the taxpayer during the taxable year from such activity.

[5]While sec. 465(a) makes no reference to partners or partnerships, a 1976 Act amendment to sec. 704(d) makes it clear that sec. 465 was intended to apply to them. The amendment provided an at-risk rule applicable to partners and partnerships which was broader in scope than sec. 465, and then excepted transactions subject to sec. 465 from the application of sec. 704(d). The report of the Conference Committee makes it clear that sec. 704(d) and 465 were intended to be applied in tandem to partners and partnerships. Conference Committee report to accompany H.R. 10612, 1976–3 C.B. (Vol. 3) 827. When the coverage of sec. 465 was substantially broadened by Pub. L. 95–600, 92 Stat. 2814, the Revenue Act of 1978, the 1976 amendment to sec. 704(d) was repealed as being no longer necessary.

ment of animals." Livestock's business involved the raising and feeding of cattle.

Section 465(b)(1) provides that amounts borrowed with respect to an "activity" are considered to be at risk if they satisfy the provisions of section 465(b)(2) and are not excluded under section 465(b)(3). Respondent maintains that the loans from Feed must be excluded under section 465(b)(3) in calculating each petitioner's at-risk amount, since the loans were borrowed from a "person" which had a relationship to each petitioner as defined in section 267(b).[6]

One of the relationships specified in section 267(b) is between "An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual." Sec. 267(b)(2). In determining the ownership of stock, section 267(c)(3) requires that an individual owning any stock in a corporation is to be considered as owning the stock owned, directly or indirectly, by his partner. As a consequence, each petitioner here is considered to own 100 percent of the Feed stock under section 267(c)(3) and is thus related to Feed under section 267(b)(2). Respondent accordingly concludes that under section 465(b)(3)(B), petitioners cannot be considered at risk with respect to any portion of the amounts borrowed from Feed.

Petitioners have advanced a variety of objections to this proposed application of the at-risk rules. Noting that section 465 was enacted in order to combat what Congress perceived to be an increasing incidence of abusive tax shelters (see S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 57, 59), petitioners insist that they were involved in a legitimate cattle-raising business and that their activities were in no way directed toward creating a tax shelter for either themselves or for third parties. They thus conclude that the statute is inapplicable in this case since their situation is not one which section 465 was intended to address.

We cannot concur with this contention. Section 465 is expressly made applicable, without limitation, to all farming

[6]Sec. 465(b)(3)(B) makes reference only to sec. 267(b). Respondent's argument proceeds upon the implied assumption that the "constructive ownership of stock" rules contained in sec. 267(c) are subsumed into the 465(b)(3)(B) reference to sec. 267(b), and petitioners nowhere challenge this assumption. This seems clearly consistent with the legislative intent since sec. 267(b) without sec. 267(c) is almost meaninglessly constrictive.

activity as defined in section 464(e). Sec. 465(c)(1)(B). Furthermore, in 1978, Congress enlarged the number of activities which would be subject to the loss limitations contained in section 465 by adding section 465(c)(3).[7] The House Report which accompanied the enactment of this provision clearly indicates that the presence of tax shelter characteristics will be a potential prerequisite to the application of section 465 only as to those activities which were included in new section 465(c)(3):

> *Loans from related and interested parties.*—The Tax Reform Act of 1976 (sec. 465(b)(3)) specifically requires that a taxpayer not be considered at risk with respect to amounts borrowed for use in an activity (or which are contributed to the activity) if the amounts are borrowed from any person who has an interest in the activity (other than that as a creditor) or who is related to the taxpayer (as described in section 267(b)). Although this rule will continue to apply without change to the four specified activities, the bill provides that, in the case of the activities which are newly made subject to the at risk provision by the bill, this automatic nonrecourse provision shall apply only to the extent provided in regulations prescribed by the Treasury. The regulations may make this provision applicable to activities involving tax shelter characteristics, such as the presence of property the value of which is subject to substantial uncertainty, activities of a speculative nature, the unavailability of similar financing on similar terms from unrelated lenders and the presence of terms or conditions under which either the loan becomes nonrecourse in later taxable years or the taxpayer can convert the obligation from a recourse obligation to a nonrecourse (or guaranteed) obligation in later years. [H. Rept. 95–1445 (1978), 1978–3 C.B. (Vol. 1) 181, 245.]

Thus, even if we were to accept petitioners' contention that their farming enterprise possessed no tax shelter characteristics, it is manifest that section 465(b)(3) would not be rendered inapplicable.[8]

Similarly, petitioners' interpretation of section 464 to buttress this argument also misses the mark. Petitioners maintain that the definition of farming contained in section 464(e)

---

[7]Sec. 201(a), Revenue Act of 1978, 92 Stat. 2814.

[8]A respected commentator, in a comprehensive paper on the at-risk rules, has observed that "Inflexible prohibitive rules will always be applied to the enumerated activities in determining whether certain borrowings will be considered amounts at risk * * * . Pursuant to section 465(b)(3), borrowings from a related party * * * are not intended to provide the debtor with an amount at risk." Gould, "Problems Encountered in Working With the At-Risk Provisions," 58 Taxes 868, 870 (1980).

was inserted for the purpose of complementing the definition of a "farming syndicate" found in section 464(c), and that the application of the at-risk rules hinges on the existence of a farming syndicate. However, it is readily apparent that section 465(c)(1)(B) refers only to section 464(e) for purposes of defining "farming." Had Congress intended to limit the at-risk rules to farming syndicates (defined in section 464(c) rather than farming generally defined in 464(e)), we presume it would have done so by a direct inclusion of farming syndicates among the activities enumerated in section 465(c)(1).

Petitioners further contend that since Livestock was a cash basis taxpayer, it sustained an actual economic loss because actual dollars—the loan proceeds—were expended by the partnership. This contention also loses sight of the issue. The question is not whether cash disbursements were actually made, the consequences of which were a "real" or economic loss, but rather, whether the otherwise deductible loss is limited because petitioners' at-risk amounts are not great enough to encompass the loss. As is clearly indicated by S. Rept. 94–938, *supra*, the taxpayer's method of accounting is irrelevant to this determination:

> The at risk limitation also applies regardless of the method of accounting used by the taxpayer and regardless of the kind of deductible expenses which contributed to the loss. [1976–3 C.B. (Vol. 3) 49, 86.]

Next, petitioners argue that Feed was merely a conduit through which the advances flowed from the bank to Livestock. Petitioners point to the testimony of D. W. Caldwell, an executive vice president of the bank, as a demonstration of the bank's awareness that some of the funds advanced to Feed would be used in other business activities in which petitioners were engaged. Petitioners insist that the funds were advanced to Livestock on Feed's line of credit simply as a matter of convenience for all parties concerned. Although this argument might appear appealing on the surface, the record does not support a finding that the loan proceeds flowed via Feed as a pipeline to Livestock.

We have found as a fact that Feed and Livestock exchanged checks on December 30, 1976, in the identical amounts of $144,674.85. Further amounts were lent by Feed to Livestock in 1977. The record also reveals periodic loans from the bank to Feed in various amounts, beginning in 1969 and continuing

through the years in issue. But there is no perceptible correlation between amounts borrowed and lent by Feed which would support a conduit argument. In support of such an argument, one would expect to see at least a rough correlation in dates and amounts between amounts borrowed from the bank and amounts lent to Livestock. However, no such correlation has been demonstrated and we are convinced that none exists.

Furthermore, there is no evidence concerning the bank's legal relationship or understanding with Livestock insofar as the advanced funds were concerned. The bank established a line of credit with Feed in 1969, several years before Livestock came into existence. Caldwell testified merely that the bank let Feed control the loan proceeds. The testimony to the effect that the bank considered petitioners as the primary obligors with respect to the bank's advances[9] is at best unclear and in any event inconsistent with the nature of guaranty agreements.[10] The fact remains that the line of credit with the bank was in Feed's name and was entered into long before Livestock came into existence. The moneys Feed advanced to Livestock were separate and distinct from the bank's transactions with Feed. See *Bell Realty Trust v. Commissioner*, 65 T.C. 766, 774 (1976); cf. *Oak Hill Finance Co. v. Commissioner*, 40 T.C. 419 (1963).[11]

Finally, petitioners present a series of arguments concerning their contention that section 267(b) should not be applied to preclude petitioners from being at risk. These arguments will be analyzed to the extent they are not merely a rehash of the points which we have previously discussed with respect to petitioners' conduit theory.

Petitioners have examined all of the loans among the various entities—specifically, Feed's debts to its shareholders and to the bank and petitioners' liability to Feed (under State

---

[9]In response to the question "Would not Feeds then be primarily liable [for the borrowed amounts]?" posed by respondent's trial counsel, Caldwell testified as follows:

"Well, the way we looked at these, any guarantor, and this guaranty says that in legal language, they are primarily, as well as the guarantors and cosigners. There weren't any cosigners, however."

[10]A guaranty contract is, by definition, collateral to the primary obligation. The guarantor of a debt promises to pay in the event of the primary obligor's default. See, e.g., *Continental National Bank v. Dolan*, 39 Colo. App. 16, 564 P.2d 955 (1977).

[11]See also *Blair Holding Co. v. Commissioner*, T.C. Memo. 1980–79.

law as partners of Livestock)—and have concluded that they were at risk because the amounts Feed owed them were greater than the amounts they owed Feed. In support of this conclusion, petitioners argue that since the obligations of Feed to its shareholders (petitioners) were subordinated to Feed's obligations to the bank, petitioners would not receive any repayment on these loans until the bank was first paid. Moreover, petitioners point out that in view of Feed's continued losses (commencing with the fiscal year ending July 31, 1975), Feed was not able to pay the bank obligations and that, as a consequence of petitioners' guarantees, they ultimately utilized their own personal assets to satisfy Feed's obligations to the bank. Petitioners contend that since they eventually paid off the Feed bank loans, this confirms their being at risk for those amounts during 1976 and 1977. This argument, we feel, is but a reprise of a theme already played, namely, that notwithstanding the clear mandate of the statute (that loans from related parties do not put the borrower at risk), the petitioners were, as a practical matter, at risk. Whether or not as a factual matter this contention is supported by the record—which we need not determine—the fact remains that the loans to Livestock came from Feed, not the bank, and as such do not put petitioners statutorily at risk.

As a final matter, we observe that section 465(a) expressly provides that any loss from the "activity" is to be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk for such activity at the close of the taxable year. Therefore, petitioners' efforts to highlight the significance of the liquidation of the debts at a time subsequent to the years before us do not assist petitioners in establishing that they were at risk at the close of the years 1976 and 1977. Whether the losses in question can be carried over and made available to petitioners in a subsequent period or periods is not before us and we express no opinion with regard thereto.

To reflect the foregoing and certain matters no longer in controversy,

*Decisions will be entered under Rule 155.*