SAM H. BENNION AND ESTATE OF FAYE J. BENNION,
DECEASED, MARK J. BENNION, PERSONAL
REPRESENTATIVE, PETITIONERS v.
COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 23681-84.          Filed March 26, 1987.

*Craig C. Mortensen* and *J. Jay Bullock*, for the petitioners.

*Randy G. Durfee*, for the respondent.

SWIFT, *Judge*: In a statutory notice of deficiency dated April 13, 1984, respondent determined a deficiency in petitioners' Federal income tax liability for 1980 in the amount of $50,028. After concessions, respondent reduced his deficiency determination to $20,364. The primary issue for decision is whether petitioner Sam H. Bennion is at risk

within the meaning of section 465[1] with respect to his pro rata share of the recourse debt obligations of a joint venture of which he was a member.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioner Sam H. Bennion resided in Idaho Falls, Idaho, on the date the petition herein was filed. His wife, Faye J. Bennion, died in June of 1980. Hereinafter, references to "petitioner" will be to Sam H. Bennion.

During the years in issue, Matrix Computer Funding Corp. (Matrix), a corporation organized under the laws of Arizona, was engaged in the business of purchasing and leasing computer equipment. Matrix generally obtained financing for the purchase of computer equipment from an independent commercial bank and repaid the principal and interest on the bank debt from monthly payments it received under leases of the equipment. Often, Matrix would lease the equipment back to the former owners. Matrix also often resold computer equipment it purchased to individual investors and partnerships.

The transactions giving rise to the issues in' this case involve IBM check sorters. The parties agree as to certain characteristics of IBM check sorters as follows. IBM 3890 check sorters (which first came on the market in the early 1970's) read, sort, microfilm, and cancel checks at very high rates of speed (e.g., 40 checks per second). Check sorters do not become obsolete as quickly as other types of computer equipment because they are primarily mechanical devices. Few new models of check sorters have become available. Check sorters can be improved and enhanced by adding new features to the basic equipment. For the above reasons, check sorters generally retain their value better than other types of computer equipment. At the time of trial, virtually all IBM 3890 check sorters ever sold were still in use.

On or about October 11, 1979, Matrix purchased from and leased back to the United States National Bank of Oregon (National Bank of Oregon) three used IBM 3890 check

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the year in issue.

sorters.[2] The National Bank of Oregon had leased the three check sorters from IBM during the years 1977 and 1978 for use in its business. In 1979, the National Bank of Oregon had purchased the three check sorters from IBM.

To finance the purchase of the three check sorters from the National Bank of Oregon, Matrix borrowed $1,305,341.70 from the Bank of America National Trust & Savings Association (hereinafter referred to as the bank or Bank of America). Matrix executed a recourse promissory note dated October 15, 1979, in favor of the bank for the principal amount of the loan. Principal and simple interest, which accrued at 12.25 percent per annum, were due in monthly installments of $23,395, beginning December 1, 1979, and ending October 1, 1986.

Matrix granted to the bank a security interest in the three check sorters. Although the security agreement stated that Matrix would not sell or otherwise dispose of the collateral that secured the loan (namely, the three check sorters) other than in the ordinary course of its business, bank officials were aware that it was in the ordinary course of Matrix's business to resell equipment it had purchased. Also, the purchase documents between the National Bank of Oregon and Matrix (a copy of which the bank would have received to document the loan) expressly disclosed that Matrix intended to resell the check sorters.

Upon purchasing the check sorters, Matrix leased the three check sorters back to the National Bank of Oregon under the terms of a typical net lease.[3] The lease agreement called for 84 monthly lease payments in the amount of $23,395 to be paid by the National Bank of Oregon beginning October 11, 1979. The leasehold interest of the

---

[2]The price Matrix paid for the three check sorters is not in the record. The parties agree, however, that the sale-leaseback transaction occurred at arm's length.

[3]The lease agreement provided that the National Bank of Oregon was responsible for all costs and expenses of the three check sorters, as follows:

10. Net Lease:

Except as otherwise specifically provided in this Lease, it is understood and agreed that this is a net lease, and that, as between Lessor and Lessee, Lessee shall be responsible for all costs and expenses of every nature whatsoever arising out of or in connection with or related to this Lease or the Equipment (including, but not limited to, transportation in and out, rigging, drayage, packing, installation and disconnect charges). Lessee hereby agrees that in the event that Lessee fails to pay or perform any obligation under this Lease, Lessor may, at its option, pay or perform said obligation and any payment made or expense incurred by Lessor in connection therewith shall become additional rent which shall be due and payable by Lessee upon demand.

National Bank of Oregon in the three check sorters expressly was made subordinate to the security interest granted therein to the bank (Bank of America) by Matrix in connection with Matrix's $1,305,341.70 recourse promissory note issued to the bank.

In an agreement entitled "Assignment of Lease Rentals," dated October 17, 1979, Matrix assigned to the bank all payments due under the lease from the National Bank of Oregon, and the National Bank of Oregon agreed to pay directly to the bank the lease payments owed to Matrix. The $23,395 monthly lease payment to be paid by the National Bank of Oregon was the same amount as the monthly principal and interest payment to be made by Matrix on Matrix's $1,305,341.70 promissory note to the bank. The sale and leaseback transaction was structured so that Matrix's monthly debt service on the $1,305,341.70 bank loan would be paid entirely from the monthly payments on the lease.

On December 1, 1980, Matrix sold one of the three IBM check sorters on lease to the National Bank of Oregon to Thomas M. Lloyd (Lloyd). The sales agreement provided that Lloyd's ownership interest in the check sorter would be subject to the security interest of the bank therein. Matrix assigned to Lloyd the portion of the lease payments from the National Bank of Oregon attributable to the check sorter purchased by Lloyd, subject to the prior assignment of those lease payments to the bank.

In consideration for the purchase of the check sorter, Lloyd agreed to pay Matrix a total of $519,690. The purchase price was to consist of a cash downpayment of $35,000, payable upon execution of the sales agreement, a deferred payment of $41,681 reflected by a recourse promissory note given by Lloyd to Matrix, and a so-called guarantee agreement in favor of Matrix with respect to a portion of Matrix's recourse debt obligation to the bank in an amount not to exceed $443,009.[4]

---

[4] As explained, the bank loan obtained by Matrix related to three check sorters and was for $1,305,341.70. The portion of the bank loan attributable to the one check sorter sold to Lloyd was one-third thereof or $435,113.90. The difference between $435,113.90 (one-third of the total bank loan) and Lloyd's $443,009 liability under the guarantee agreement apparently is attributable to certain equipment enhancements associated with the particular IBM check sorter purchased by Lloyd.

Lloyd transferred to Matrix an interest in an office building he owned (valued at $35,000), in lieu of the $35,000 cash downpayment. Lloyd also gave Matrix a recourse promissory note in the amount of $41,681, which accrued simple interest at 9 percent per annum. Payments of principal were due on the promissory note as follows: $25,000 on July 1, 1981, and $16,681 on July 1, 1982. Accrued interest payments also were due on those dates. As collateral for the recourse promissory note, Lloyd gave Matrix a security interest in the check sorter and in the lease payments with respect thereto, which security interest was subordinate to the security interest therein previously granted to the bank.

Lloyd executed in favor of Matrix the guarantee agreement, under which Lloyd agreed to pay Matrix's debt obligation to the bank up to an amount not to exceed $443,009. If a default occurred on the bank loan (after taking into account any proceeds from the sale of the collateral securing the loan), Lloyd agreed under the guarantee agreement to pay directly to the bank an amount sufficient to pay off Matrix's outstanding debt obligation to the bank, or $443,009, whichever was less. Lloyd also agreed to indemnify Matrix against all losses Matrix might incur by reason of Lloyd's failure to perform his obligations under the agreement. Lloyd had no right of reimbursement from Matrix if, upon Matrix's default, Lloyd was required to pay the bank loan up to the maximum amount of Matrix's liability therefor (namely, $443,009).

In connection with his purchase of the check sorter, Lloyd entered into a remarketing agreement with Matrix, under which Matrix agreed to act as Lloyd's sole and exclusive agent in re-leasing or selling the check sorter. The remarketing agreement provided that Lloyd was to receive the first $55,000 of proceeds realized from any subsequent lease or sale of the check sorter and that net proceeds realized thereafter would be shared equally between Matrix and Lloyd.

Within 2 weeks after Lloyd purchased the check sorter, he formed a joint venture with petitioner. Petitioner owned a 75-percent interest and Lloyd owned a 25-percent interest in the joint venture. By an agreement dated December 15,

1980, the joint venture purchased the check sorter from Lloyd for $524,590. The purchase price was to be paid with a $40,000 cash downpayment, a $41,681 recourse promissory note, and a $443,009 guarantee agreement executed by the joint venture in favor of Lloyd. The promissory note and the guarantee agreement were to be identical in all relevant respects to the promissory note and guarantee agreement executed by Lloyd in favor of Matrix.

Petitioner paid Lloyd $30,000 in cash on December 17, 1980, representing his 75-percent share of the $40,000 cash downpayment due from the joint venture. The joint venture executed the $41,681 recourse promissory note and the guarantee agreement in favor of Lloyd. The joint venture became obligated under the guarantee agreement to pay Matrix's debt obligation to the bank up to an amount not to exceed $443,009. The guarantee agreement expressly provided that upon default of Matrix's debt to the bank, the joint venture would be required to pay to the bank amounts due on the bank loan. The joint venture made payments of principal and interest on the $41,681 promissory note to Lloyd as the payments became due.

As part of its purchase of the check sorter, the joint venture entered into a remarketing agreement identical in all relevant respects to the remarketing agreement Lloyd had entered into with Matrix, under which Matrix agreed to act as exclusive agent for remarketing the check sorter upon expiration or earlier termination of the lease to the National Bank of Oregon. The agreement provided that the first $55,000 of proceeds realized from the re-lease or sale of the check sorter by Matrix would be remitted to the joint venture. Net proceeds in excess of $55,000 would be shared equally.

On February 13, 1981, Matrix notified the bank of the sale of the check sorter to Lloyd. The record herein does not indicate when the bank was notified of the sale of the check sorter to the joint venture.

The parties agree that the purchase price reflected in each sale of the check sorter involved herein (the sale from the National Bank of Oregon to Matrix, the sale from Matrix to Lloyd, and the sale from Lloyd to the joint venture) reflected the fair market value of the check sorter on the

date of each sale. Also, the parties agree that in all other respects, the transactions involved herein occurred at arm's length. Furthermore, the parties agree that as of December of 1980, the projected fair market value of the residual interest in the check sorter on the scheduled termination date of the lease with the National Bank of Oregon was at least 45 percent of the $519,690 purchase price paid therefor by the joint venture.

As of June of 1982, petitioner had paid Lloyd, in addition to the $30,000 cash downpayment, an additional $33,919, representing his 75-percent share of principal and interest due on the joint venture's $41,681 promissory note. Lease payments with respect to the check sorter have covered the debt service on the bank loan, and no payments have been made by the joint venture under the guarantee agreement.

The following table summarizes the terms of the sale of the check sorter from Matrix to Lloyd, and from Lloyd to the joint venture:

|  | Terms of sale from: | |
|---|---|---|
|  | Matrix to Lloyd | Lloyd to joint venture |
| Cash | $35,000 | $40,000 |
| Recourse promissory note | 41,681 | 41,681 |
| Guarantee agreement with respect to bank loan | 443,009 | 443,009 |
| Total purchase price | 519,690 | 524,690 |

The joint venture timely filed a Federal partnership return for 1980 which reflected income and deductions with respect to the check sorter, as follows:

| | |
|---|---|
| Rental income | $8,802 |
| Depreciation expense | (78,704) |
| Other expenses[5] | (4,522) |
| Net loss | (74,424) |

The partnership return filed by the joint venture reported a depreciable basis for the check sorter of $524,690, computed as follows:

| | |
|---|---|
| Cash contributed by Lloyd | $10,000 |
| Cash contributed by Bennion | 30,000 |

[5]The "Other expenses" reported on Schedule H of the 1980 partnership return are not explained in the record.

Promissory note of joint venture to Lloyd.......... $41,681
"Guarantee" of bank note ........................ 443,009
Total depreciable basis in equipment .............. 524,690

The $74,424 loss reported on the return was allocated 75 percent to petitioner ($55,818) and 25 percent to Lloyd ($18,606). Petitioner reported the $55,818 loss on his and his deceased wife's joint Federal income tax return for 1980.

Respondent's notice of deficiency, dated April 13, 1984, was mailed to petitioner at P.O. Box 2436, Idaho Falls, Idaho, which is the address of petitioner's former place of employment. The notice of deficiency was received by petitioner's former employer on April 16, 1984, and was promptly forwarded to petitioner's home address in Salt Lake City, Utah. Petitioner received the notice of deficiency on April 20, 1984, and his petition was timely filed on July 6, 1984.

## OPINION

### At Risk Issue

Section 465, among other things, provides that where an individual engages in the leasing of depreciable property, any loss claimed with respect to his investment shall be allowed only to the extent the taxpayer is at risk with respect to the activity at the close of the taxable year. Sec. 465(a)(1); sec. 465(c)(1)(C).[6] Included in the amount for which a taxpayer is considered at risk are amounts of cash contributed to the activity by the taxpayer and amounts borrowed with respect to the activity. Sec. 465(b)(1). For a taxpayer to be considered at risk with respect to borrowed amounts for use in such an activity, the taxpayer must be personally liable for repayment of the borrowed amounts or have pledged property, other than property used in the

---

[6]Sec. 465 was added to the Internal Revenue Code by the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, and is applicable to taxable years beginning after Dec. 31, 1975. Although sec. 465(a) makes no reference to partners or partnerships, it is clear that sec. 465 was intended to apply to partners and partnerships. See *Melvin v. Commissioner*, 88 T.C. 63 (1987). Similarly, sec. 465 applies to individuals who participate in joint ventures.

activity, as security for the borrowed amounts. Sec. 465(b)(2).[7]

We recently held that with respect to a particular debt obligation, an individual will be regarded as personally liable within the meaning of section 465(b)(2)(A) if he has the ultimate liability to repay the debt obligation in the event funds from the activity are not available for that purpose. *Melvin v. Commissioner*, 88 T.C. 63 (1987); *Gefen v. Commissioner*, 87 T.C. 1471, 1500-1503 (1986); *Abramson v. Commissioner*, 86 T.C. 360, 375-376 (1986).

Section 465(b)(4)[8] provides further that amounts that are protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements" are not considered at risk. Although the legislative history of section 465 does not specifically define what is meant by the words "other similar arrangements," it does evidence concern with situations in which taxpayers are effectively immunized from any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable. Those situations include nonrecourse financing, various insurance agreements, stop loss agreements, and other arrangements for compensation or reimbursement to the taxpayer for any loss he may suffer. *Melvin v. Commissioner, supra; Porreca v. Commissioner*, 86 T.C. 821, 838 (1986); S. Rept. 94-939, at 49 (1976), 1976-3 C.B. (Vol. 3) 49, 87.

Where a taxpayer's obligation constitutes only a secondary liability under which the taxpayer would have a legal right of reimbursement against the primary obligor, the taxpayer will not be treated as at risk with respect to such an obligation. The taxpayer's reimbursement from the

---

[7]Sec. 465(b)(2) provides as follows:

(2) BORROWED AMOUNTS.—For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he—

(A) *is personally liable for the repayment of such amounts*, or

(B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property).

No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1).

[8]Sec. 465(b)(4) provides as follows:

(4) EXCEPTION.—Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

primary obligor is regarded as a type of "protection against loss" within the meaning of section 465(b)(4). *Melvin v. Commissioner, supra* at 71; *Brand v. Commissioner*, 81 T.C. 821, 828 (1983).

In addition, amounts borrowed for use in an activity are not considered at risk if such amounts are borrowed from a person who has an interest in the activity, other than an interest as a creditor. Sec. 465(b)(3).[9]

Petitioner herein contends that (in addition to cash invested) he is at risk within the meaning of section 465 with respect to his pro rata share of the following debt obligations of the joint venture: (1) The liability to pay Matrix's debt obligation to the bank up to $443,009; and (2) the liability to pay the $41,681 recourse promissory note issued to Lloyd. Petitioner argues that for Federal income tax purposes, the joint venture's obligation under the guarantee agreement is not that of a true guarantor, but actually constitutes an assumption by the joint venture of $443,009 of Matrix's debt obligation to the bank. Petitioner further argues that the joint venture became personally and primarily liable on Matrix's debt obligation to the bank in the amount of $443,009, and that the joint venture has no right of reimbursement or other protection against loss with respect to that amount from either Matrix or Lloyd. Petitioner also argues that the joint venture is primarily liable on the $41,681 recourse promissory note to Lloyd.

Lastly, petitioner contends that the creditors on the $443,009 debt obligation under the guarantee agreement and on the $41,681 recourse promissory note have no interests in the activity other than as creditors. Petitioner argues that to the extent of his pro rata interest in the joint venture, he should be regarded as personally and primarily liable on the debt obligations of the joint venture.

Respondent concedes that petitioner's basis in the debt obligations of the joint venture (namely, the $443,009

---

[9]Sec. 465(b)(3) provides as follows:

(3) CERTAIN BORROWED AMOUNTS EXCLUDED.—For purposes of paragraph (l)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who—

    (A) has an interest (other than an interest as a creditor) in such activity, or

    (B) has a relationship to the taxpayer specified within any one of the paragraphs of section 267(b).

guarantee agreement and the $41,681 recourse promissory note) is established to the extent of petitioner's pro rata share of those obligations. Respondent also concedes that petitioner is personally and primarily liable to the extent of his pro rata share of the $41,681 promissory note issued to Lloyd. Respondent contends, however, that the individual members of the joint venture are not to be regarded as personally and primarily liable with respect to the $443,009 bank loan, because the joint venture's liability under the guarantee agreement ran "directly" to Lloyd and/or to Matrix, but not "directly" to the bank. Respondent argues that the bank was, at most, a third-party beneficiary of the joint venture's agreement with Lloyd to pay the bank upon default by Matrix on the bank loan.

Respondent also contends that Lloyd and Matrix are persons who have interests in the activity other than as creditors, and, on this ground, respondent argues that petitioner is not to be regarded as at risk on either the $443,009 bank loan or the $41,681 promissory note. Respondent argues that Lloyd has a prohibited continuing interest in the activity as a participant in the joint venture. If the obligations of the joint venture are regarded as running to Matrix, respondent argues that Matrix has a prohibited continuing interest in the net profits of the joint venture by virtue of its interest under the remarketing agreement.

## Personal Liability of the Joint Venture

With respect to the $443,009 liability on the bank loan, it is clear that the joint venture has the primary, personal, and ultimate liability to repay the bank loan if the lease payments with respect to the check sorter cease and the underlying security is inadequate to pay the bank. There is no reimbursement mechanism or other protection against loss that protects the joint venture from ultimate liability. If default occurs on the bank loan and the foreclosure on the security does not satisfy the loan, the bank likely would sue Matrix, Lloyd, or the joint venture, or all of them. If the bank obtained any payment from Matrix or Lloyd, it is clear that Matrix and Lloyd would have a right of reimbursement against the individual members of the joint venture.

Denominating the joint venture agreement with respect to the bank loan as a "guarantee agreement" does not preclude the individual members of the joint venture from establishing (as petitioner has) that their liability thereunder was primary, and that their liability was not that of a mere guarantor with only a secondary liability. See *Abramson v. Commissioner, supra* at 375. Also, whether the liability of the joint venture with respect to the bank loan flowed "directly" to the bank (or only to the bank through Lloyd and Matrix) is not part of the relevant analysis in determining who is ultimately liable on a recourse debt obligation. Upon default of the bank loan, ultimate liability for $443,009 thereof eventually will fall upon the members of the joint venture. As we recently stated in *Melvin v. Commissioner, supra* at 75—

the fact that the partnership or other partners remain in the "chain of liability" should not detract from the at-risk amount of the parties who do have the ultimate liability. The critical inquiry should be who is the obligor of last resort, and in determining who has the ultimate economic responsibility for the loan, the substance of the transaction controls. * * * [Citing *United States v. Raphan,* 759 F.2d 879, 885 (Fed. Cir. 1985).]

For the reasons stated above, the joint venture is to be regarded as personally liable under section 465(b)(2) with respect to the bank loan. Accordingly, petitioner is to be regarded as at risk with respect to his pro rata share thereof if we determine that such obligation does not represent an amount borrowed from a person with an interest in the activity other than an interest as a creditor.

## Interests Other Than Interests as Creditors

As explained, with respect to both the $443,009 bank loan and the $41,681 promissory note, respondent contends that the creditors have interests in the activity other than as mere creditors. The language "interest (other than an interest as a creditor)" (see sec. 465(b)(3)(A)[10]) is not defined in section 465 or the committee reports accompanying the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, which enacted section 465.

---

[10]The text of sec. 465(b)(3)(A) is set out in note 9 *supra.*

In the General Explanation of the Tax Reform Act of 1976, however, it is stated that persons having an interest in the activity include, in the case of a partnership, all partners and "any other person (such as a promoter or selling agent) who stands to receive financial gain from the activity or from the sale of an interest in the activity." Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, at 39, 1976-3 C.B. (Vol. 2) 51. This statement would suggest that *any type of financial interest* in the activity (other than as a creditor) would constitute a prohibited "other interest" under section 465. In 1979, however, the Treasury issued proposed regulations under section 465(b)(3) which provide that a lender will be deemed to have a prohibited interest only if it has either a "capital interest" in the activity, or an interest in the "net profits" of the activity. Sec. 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979).[11]

A "capital interest" is described in the proposed regulations as an interest in the assets of an activity which are distributable to the owner of the interest upon liquidation of the activity. Sec. 1.465-8(b)(2), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979). Accordingly, under the proposed regulations, amounts loaned between partners and between joint venturers would not be at risk because the creditor would hold a prohibited interest in the activity.

An interest in the net profits of an activity may exist, under the proposed regulations, even though the lender does not possess any incidents of ownership in the activity. For example, an employee or independent contractor whose

---

[11]Sec. 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979), provides, in relevant part:

(b) *Loans for which the borrower is personally liable for repayment—(1) General rule.* If a borrower is personally liable for the repayment of a loan for use in an activity, the lender shall be considered a person with an interest in the activity other than that of a creditor only if the lender has either a capital interest in the activity or an interest in the net profits of the activity.

(2) *Capital interest.* For the purposes of this section a capital interest in an activity means an interest in the assets of the activity which is distributable to the owner of the capital interest upon the liquidation of the activity. The partners of a partnership and the shareholders of a corporation described in section 1371(b) are considered to have capital interests in the activities conducted by the partnership or corporation.

(3) *Interest in net profits.* For the purposes of this section it is not necessary for a person to have any incidents of ownership in the activity in order to have an interest in the net profits of the activity. For example, an employee or independent contractor any part of whose compensation is determined with reference to the net profits of the activity will be considered to have an interest in the net profits of the activity.

compensation is in whole or in part determined with reference to the net profits of the activity is described as having an interest in the net profits of the activity. Sec. 1.465-8(b)(3), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979). An employee or independent contractor whose compensation is based on gross profits of the activity, under the proposed regulations, would not be regarded as having a prohibited other interest. Sec. 1.465-8(b)(4), Example (2), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979). In 1984, Congress authorized the Treasury Department to promulgate legislative regulations under section 465(b)(3).[12] The proposed regulations, however, have not yet been finalized.

The statutory language "interest other than an interest as a creditor" also is found in section 302, which pertains to distributions received by a shareholder in connection with stock redemptions. Section 302(c)(2)(A)(i) provides that the family attribution rules of section 318 will apply in determining the ownership of stock that is redeemed unless—

immediately after the distribution the distributee has no interest in the corporation (including an interest as officer, director, or employee), *other than an interest as a creditor*. [Emphasis added.]

The regulations under section 302, interpreting the "interest other than an interest as a creditor" language of that section, state that such other interests include interests that are proprietary in nature and interests that are subordinate to the claims of the corporation's general creditors. Sec. 1.302-4(d), Income Tax Regs.

In addition to the limited guidance available from the above sources, in analyzing the issue before us we look to the policy underlying section 465(b)(3)(A), which apparently was to exclude from at-risk amounts those amounts that are borrowed from creditors who, because of the nature of their

---

[12]In 1984, sec. 465(b)(3)(A) was amended by sec. 432(c) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 814, to provide, among other things, a change in the language of sec. 465(b)(3)(A), as follows:

(3) CERTAIN BORROWED AMOUNTS EXCLUDED.—

(A) IN GENERAL.—*Except to the extent provided in regulations*, for purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who has an interest in such activity or from a related person to a person (other than the taxpayer) having such an interest. [Emphasis added.]

continuing other interests in the activity, would not be likely to act as independent creditors with respect to the debt owed to them. See Howard & Rosenberg, "Working with the Proposed At-Risk Regs: Needed Clarification, Unresolved Problems," 51 J. Taxation 342, 345 (1979). Creditors who hold recourse obligations, but who also have certain other interests in the activity, might disregard their rights thereunder in favor of protecting or enhancing their other interests in the activity. In light of that eventuality and in spite of the otherwise recourse nature of the debt, taxpayers who owe recourse debt obligations to such creditors are not to be regarded as at risk with respect thereto.

Lloyd, as a member of the joint venture, held a capital, proprietary interest in the lease of the check sorter after its sale to the joint venture. Matrix, under the terms of the remarketing agreement, held an interest in the net profits of the lease after the sale to Lloyd. Both of those interests constitute prohibited other interests under section 465(b)(3)(A).

The parties agree that the bank had no interest in the activity other than as a creditor. The issue herein thus turns on whether the personal and ultimate liability of the joint venture with respect to the bank loan (which we have held exists in this case) fails to meet the requirements of section 465(b)(3)(A) because intermediate creditors with respect to the activity (namely, Lloyd and Matrix) have continuing prohibited interests for purposes of section 465(b)(3)(A).

Neither party addresses this issue directly, but reverts primarily to his arguments on the previous issue. Petitioner argues that the joint venture was directly and personally liable to pay the bank loan, and that because the bank had no prohibited interest, petitioner is entitled to his claimed at-risk amount with respect to that loan. Respondent argues that the joint venture was not "directly" liable to the bank and that it is therefore irrelevant that the bank did not have a prohibited interest in the activity. Respondent argues that the only creditors to whom the joint venture was "directly" liable (namely, Lloyd and Matrix) had prohibited other interests.

For purposes of section 465(b)(3)(A), we conclude that where a taxpayer is primarily and ultimately liable within the meaning of section 465(b)(2)(A) to a number of creditors in a chain of liability (e.g., in this case, to Lloyd, Matrix, and the bank), the "interest other than an interest as a creditor" prohibition of section 465(b)(3)(A) must be analyzed at each link of the chain. The mere fact that some of the creditors are tainted (by continuing to have interests other than as creditors) is not fatal to the argument that at the end of the chain there is an independent creditor, with no other interest, who stands fully prepared to enforce the terms of the recourse debt obligation owed to him by the taxpayer. That is the situation with respect to the $443,009 liability of the joint venture under the guarantee agreement.

Petitioner, as a member of the joint venture, is the ultimate debtor with respect to the bank loan. The ultimate creditor with respect thereto is the bank, and the bank has no interest in the joint venture other than as a creditor. Should default occur, the liability of the joint venture was to pay the bank, not to pay Lloyd or Matrix. Accordingly, under Utah law and on the facts of this case, the bank would be regarded as an intended third-party beneficiary with the right to sue the members of the joint venture directly upon default by Matrix on the bank loan. *Tracy Collins Bank & Trust v. Dickamore*, 652 P.2d 1314, 1315 (Utah 1982); *Rio Algom Corp. v. Jimco Ltd.*, 618 P.2d 497, 506 (Utah 1980); *Schwinghammer v. Alexander*, 21 Utah 2d 418, 446 P.2d 414, 415 (1968).[13] This would be the case

---

[13]In *Schwinghammer v. Alexander*, 21 Utah 2d 418, 446 P.2d 414, 415 (1968), the Utah Supreme Court explained with regard to the rights of third-party beneficiaries—

"A third party who is not a promisee and who gave no consideration has an enforceable right by reason of a contract made by two others (1) if he is a creditor of the promisee or of some other person and the contract calls for a performance by the promisor in satisfaction of the obligation; or (2) if the promised performance will be of pecuniary benefit to him and the contract is so expressed as to give the promisor reason to know that such benefit is contemplated by the promisee as one of the motivating causes of his making the contract. A third party may be included within both of these provisions at once, but need not be. * * * "

Because the bank clearly was the creditor of Matrix (who qualifies as "the promisee or some other person") and because the guarantee agreement placed upon the joint venture the ultimate liability to pay off the bank loan, the joint venture, as promisor, was required to satisfy the obligation owed to the bank. The bank therefore qualifies as an intended third-party beneficiary and could sue the joint venture directly for payment of the bank loan. See also *Fleck v. National Property Management, Inc.*, 590 P.2d 1254, 1257 (Utah 1979) (Hall, C.J., concurring); 2 Restatement, Contracts 2d, secs. 302-310 (3d ed. 1981); 2 Williston, Contracts, sec. 356A (3d ed. 1979).

regardless of when the bank received notice of the sale of the check sorter to the joint venture. *Smith v. Bowman*, 32 Utah 33, 88 P. 687, 688 (1907). Such facts establish that petitioner is entitled to the claimed at-risk amount with respect to his pro rata share of the $443,009 bank loan.

We do not have, in this case, the situation where the independent creditor must seek enforcement of its rights on the debt obligation through intermediate creditors who have prohibited other interests in the activity of the debtor. We leave for another day the resolution of whether the prohibited interests of intermediate creditors in that situation would require denial of at-risk amounts to the ultimate debtor under section 465(b)(3).

*Peters v. Commissioner*, 77 T.C. 1158 (1981), does not require a contrary result. That case involved the limitation on the at-risk amounts set forth in section 465(b)(3)(B), which concerns amounts borrowed from related parties.[14] Under the facts of that case, we held that a loan obtained by a partnership from a related corporation was separate and distinct from a loan obtained by the related corporation from an unrelated commercial bank. Accordingly, the argument could not successfully be made therein that the partnership debt to the related corporation should be treated as a debt to the unrelated bank.

Here, the joint venture's liability under the $443,009 guarantee agreement was expressly dependent upon, and related back to, the loan obtained by Matrix from the bank. The loan proceeds received from the bank paid for the check sorter, and it is only those precise loan proceeds that the joint venture became obligated to repay upon its purchase of the check sorter. In summary, we hold that petitioner is at risk with respect to his pro rata share of the joint venture's $443,009 liability under the guarantee agreement. Regardless of whether Lloyd or Matrix is regarded as the creditor with respect to the $41,681 promissory note of the joint venture, each has a prohibited interest in the check sorter. Petitioner, therefore, is not at risk with respect to his pro rata share of the $41,681 promissory note.[15]

---

[14]The text of sec. 465(b)(3)(B), is set out in note 9 *supra*.

[15]In applying the requirements of sec. 465(b)(3)(A) to the $443,009 bank loan at issue herein, our analysis treats Matrix and Lloyd as creditors with respect to that loan. As an alternative argument on that issue, petitioner could argue that Lloyd and Matrix, under the facts of this

## Other Issues

Petitioner raises two procedural matters. Petitioner contends that respondent's statutory notice of deficiency was improperly mailed to petitioner's former business address, which was not his last known address, and therefore that the statute of limitations on assessment for 1980 was not suspended and has now lapsed. Consequently, petitioner argues that respondent now is precluded from making an assessment of additional tax for 1980. Respondent argues that because petitioner actually received the notice of deficiency and timely filed the petition herein, the erroneous mailing does not render the notice of deficiency invalid.

This issue previously has been decided in favor of the Commissioner in *Clodfelter v. Commissioner*, 527 F.2d 754, 757 (9th Cir. 1975), affg. 57 T.C. 102 (1971); *Mulvania v. Commissioner*, 81 T.C. 65, 68 (1983), affd. 769 F.2d 1376 (9th Cir. 1986); *Frieling v. Commissioner*, 81 T.C. 42, 53 (1983). We hold for respondent on this issue.

Petitioner argues that respondent has raised new issues in this case because he failed to adequately specify in the notice of deficiency the reasons for the determination set forth therein. On that ground, petitioner seeks to shift the burden of going forward with the evidence to respondent on all issues disputed herein. See Rule 142(a), Tax Court Rules of Practice and Procedure. We have decided this case on the merits of the underlying issues, considering the stipulations of the parties and the complete record submitted. This issue is moot, and a decision thereon is unnecessary.

*Decision will be entered under Rule 155.*

---

case, are not to be regarded as creditors of the joint venture, but as continuing debtors with respect to the bank loan. The bank provided the $443,009 loan proceeds. No portion of the $443,009 loan proceeds (with respect to which the joint venture became obligated under the guarantee agreement) was provided by Matrix or Lloyd to the joint venture.

Petitioner therefore could argue that Matrix in 1979, followed by Lloyd in 1980, simply passed on their respective debt obligations to the bank to the next purchaser of the check sorter, although Matrix and Lloyd retained a secondary liability with respect thereto. Under this alternative view of the transaction, the at-risk limitation of sec. 465(b)(3)(A) might not be applicable to Lloyd and Matrix with respect to the $443,009 bank loan because that limitation applies only to parties who are to be treated as continuing creditors with respect to the loan in question. Because petitioner has not made this argument and in light of our resolution of this issue on other grounds, we do not address this potential, alternative argument.