JACK TEPPER AND RENE TEPPER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tepper v. Commissioner
Docket No. 19518-88
United States Tax Court
T.C. Memo 1991-402; 1991 Tax Ct. Memo LEXIS 435; 62 T.C.M. (CCH) 505; T.C.M. (RIA) 91402; August 15, 1991, Filed *435 Decision will be entered under Rule 155. William R. Asbell, Jr., for the petitioners. Clinton M. Fried, for the respondent. SCOTT, Judge. SCOTT MEMORANDUM OPINION Respondent determined deficiencies in petitioners' Federal income tax for the calendar years 1978, 1979, and 1980 in the amounts of $ 16,176, $ 24,391, and $ 5,130, respectively. The issues for decision are: (1) Whether petitioners were at risk during the years 1978 and 1979 in the amount of $ 30,000 pursuant to a document styled "Guaranty," executed by Jack Tepper on December 26, 1978, and (2) whether petitioners were at risk during the years 1979 and 1980 in the amount of $ 25,000 pursuant to a document styled "Assumption of Personal Liability," executed by Jack Tepper on November 28, 1979. All of the facts have been stipulated and are found accordingly. Petitioners Jack Tepper and Rene Tepper, husband and wife, who resided in Boca Raton, Florida, at the time of the filing of the petition in this case, filed a joint Federal income tax return for each of the calendar years 1978, 1979, and 1980 with the Memphis Service Center, Memphis, Tennessee. An amended tax return for the 1979 calendar year and *436 two amended returns for the 1980 calendar year were filed with the Memphis Service Center on May 16, 1988. Petitioner Jack Tepper (Dr. Tepper) is a medical doctor and primary shareholder of Tepper Clinic and Hospital in Boca Raton, Florida. Petitioner Rene Tepper is employed as a supply clerk for Tepper Clinic. Petitioners report their income on the cash method. Integrated Cattle Systems I (ICS-I) is a Texas limited partnership formed to conduct an integrated cattle breeding and cattle feeding operation. On June 15, 1978, Dr. Tepper acquired 50 limited partnership units in ICS-I for $ 50,000. Petitioners made no additional capital contributions to ICS-I. The ICS-I prospectus provides in pertinent part: Partnership financing is expected to be of two types. "Non-recourse" financing, secured solely by the assets of the Partnership and for which no Partner (General or Limited) will be personally liable, is expected to be obtained primarily for Partnership feeding operations. The remaining financing will be "recourse" financing, for which the General Partner will be ultimately liable if Partnership assets are insufficient to fund repayment.
* * * The pertinent portions *437 of the ICS-I Limited Partnership Agreement are as follows: 1.01 Formation. The parties hereto agree to form, and by execution of this Agreement do hereby enter into, a limited partnership (the "Partnership") pursuant to the Uniform Limited Partnership Act, as adopted in the State of Texas by Acts 1955, 54th Leg., P. 471, Ch. 133, which Act, as amended, shall govern the rights and obligations of the parties hereto, except as herein otherwise provided. * * * 8.08 Liability for Partnership Debts: Indemnification (a) The General Partner shall be liable as general partner for liabilities and losses of the Partnership. * * * 9.01 Liability. (a) No Limited Partner shall be personally liable for any debts or obligations of the Partnership, or for any losses thereof, beyond the amount committed by him to the capital of the Partnership plus his share of undistributed profits of the Partnership, plus distributions made wrongfully to such Limited Partner unless the Limited Partner individually guarantees such debts. * * * 16.04 Claims of Limited Partners. The Limited Partners shall look solely to the assets of the Partnership for the return of their capital contributions, *438 and if the assets of the Partnership remaining after payment or discharge of the debts and liabilities of the Partnership are insufficient to return such capital contributions, they shall have no recourse against the General Partner or any Limited Partner for such purposes.
* * * On December 26, 1978, Dr. Tepper executed a document styled "Guaranty" with Continental Illinois National Bank and Trust Company of Chicago. Petitioners made no payments pursuant to the Guaranty. The relevant portions of the Guaranty are as follows: FOR VALUE RECEIVED and in consideration of any loan or other financial accommodation heretofore or hereafter at any time made or granted to INTEGRATED CATTLE SYSTEMS I, a Texas limited partnership (hereinafter called the "Debtor") by CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO (hereinafter with its successors and assigns, called the "Bank"), the undersigned hereby guarantees and assumes (the "Guaranty") the full and prompt payment when due, whether by acceleration or otherwise, and at all times thereafter, of all obligations of the Debtor to the Bank, howsoever created, arising or evidenced, whether direct or indirect, absolute or *439 contingent, or now or hereafter existing, or due or to become due (all such obligations being hereinafter collectively called the "Liabilities"). The right of recovery against the undersigned under this Guaranty is, however, limited to the amount of Thirty thousand and 00/100 Dollars ($ 30,000.00). The obligation of the undersigned under this instrument is sometimes hereinafter referred to as "Guaranty". * * * The Bank may, from time to time, at its sole discretion and without notice to the undersigned, take any or all of the following actions: * * * (e) resort to the undersigned for payment of any of the Liabilities, if the Bank shall have also resorted to property securing the Liabilities or any obligation hereunder and shall concurrently proceed against the General Partner of the Debtor. * * * This Guaranty has been delivered at Chicago, Illinois, and shall be construed in accordance with and governed by the laws of the State of Illinois. * * *
The document contains no provision in any way waiving indemnification of the signatory by the general partner. Petitioners claim to be at risk for $ 80,000 in ICS-I. This is composed of the $ 50,000 paid to acquire their limited *440 partnership units and the $ 30,000 amount set forth in the Guaranty. Petitioners on their Federal income tax return for 1978 deducted a loss of $ 72,039 from the ICS-I partnership and on their Federal income tax return for 1979 deducted a loss of $ 1,426 from the partnership. The amount of the loss claimed in each year is the amount of Dr. Tepper's distributive share of the partnership's ordinary loss as reported to him by the partnership on a Schedule K-1. Integrated Cattle Systems II (ICS-II) is a Texas limited partnership formed to conduct an integrated cattle breeding and cattle feeding operation. On March 30, 1979, Dr. Tepper acquired 50 limited partnership units in ICS-II for $ 50,000. Petitioners made no additional capital contributions to ICS-II. A supplement to the prospectus for ICS-II, dated October 25, 1979, was mailed to each limited partner. The supplement included a document styled "Assumption of Personal Liability" (Assumption agreement). Execution of the Assumption agreement was optional. On November 28, 1979, Dr. Tepper executed an Assumption agreement, the relevant portions of which are as follows: The undersigned, in consideration of credit given and *441 to be given from time to time by the holder of this instrument, (herein called the "Lender"), to Integrated Cattle Systems II, a Texas Limited Partnership, (herein called the "Partnership"), of which the undersigned is a limited partner, hereby agrees to pay and to assume primary and personal liability for the prompt payment when due of any and all liability or indebtedness of the Partnership to the Lender now existing and hereafter arising, including, but not limited to, principal, interest and all expenses of collection of any nature incurred by the Lender (all of which is hereinafter called the "Indebtedness") to the extent of Twenty-five thousand and 00/100 dollars ($ 25,000.00) even though the Indebtedness might exceed such amount, and irrespective of any invalidity of the Indebtedness, the unenforceability thereof, or the insufficiency, invalidity or unenforceability of any security interest which might be given therefor by the Partnership. The obligation of the undersigned hereunder is an absolute, unconditional and continuing assumption of primary and personal liability for payment of the Indebtedness and any renewals, consolidations, and modifications, and extensions thereof *442 and any substitution therefor. * * * The Lender shall not be required, before enforcing the liability of the undersigned hereunder, to exhaust its remedies against the Partnership or any other person liable on the Indebtedness, including any partner of the Partnership, General or Limited, or attempt to collect on or resort to any security for the Indebtedness. Payment by the undersigned hereunder shall not entitle the undersigned by contribution, indemnification, subrogation or otherwise to any payment by any other person, including the General Partner, the right to which is herein expressly waived and renounced by the undersigned. * * * * * * This instrument is to be construed according to the laws of the state of the principal business of the Lender. * * * In addition, the undersigned agrees that if the General Partner in any way out of its own assets has to pay any portion of the liability to the Lender, the undersigned agrees that this Assumption of Personal Liability shall run to and be in favor of the General Partner to the extent the payment by the General Partner, limited to the amount of this Assumption of Personal Liability. This Assumption of Personal Liability *443 is hereby delivered to Premier Angus, Inc., a General Partner of the Partnership ("General Partner"), with the authority of such General Partner to deliver this Assumption of Personal Liability to one or more Lenders as the General Partner may determine. Upon redelivery of this Assumption of Personal Liability by any Lender to the Partnership or the General Partner, the undersigned hereby authorizes the General Partner to deliver this Assumption of Personal Liability to any other Lender with the same binding force and effect, unless the undersigned shall give notice in writing to the General Partner to the contrary.
Petitioners made no payments pursuant to the Assumption agreement. A loan was negotiated between ICS-II and First National Bank and Trust of Oklahoma City (FNBT) and was secured by all of the assets of the partnership. On the date of the loan, the assets of the partnership were of sufficient value to secure the full amount of the loan. Additionally, the loan was guaranteed by the ICS-II general partner, Premier Angus, Inc. As a condition to granting the loan, FNBT required that some of the limited partners of ICS-II personally assume a portion of the partnership's *444 indebtedness. Petitioners claim to be at risk for $ 75,000 in ICS-II. This is composed of the $ 50,000 paid to acquire the limited partnership units and the $ 25,000 amount set forth in the Assumption agreement. Petitioners on their Federal income tax return for 1979 deducted a loss of $ 74,632 from the ICS-II partnership and on their Federal income tax return for 1980 deducted a loss of $ 712 from the ICS-II partnership. The amount of loss claimed in each year is the amount of Dr. Tepper's distributive share of the partnership's ordinary loss as reported to him by the partnership on a Schedule K-1. Respondent in the notice of deficiency to petitioners disallowed petitioners' claimed loss deductions from ICS-I to the extent of $ 22,039 and $ 1,703 for the years 1978 and 1979, respectively, with the explanation that petitioners were not at risk for such amounts. In the notice of deficiency, respondent determined that the $ 25,000 covered by the Assumption agreement claimed to be at risk by petitioners was not at risk. Accordingly respondent disallowed to the extent of $ 24,632 the ICS-II loss claimed by petitioners in 1979 and adjusted petitioners' 1980 income on the basis of *445 the $ 25,000 amount's not being at risk. Section 465(a)[1] provides that in the case of certain taxpayers engaged in an activity to which section 465 applies, losses from the activity for a taxable year will be allowed up to the aggregate amount that the taxpayer is at risk for such activity at the close of such taxable year. Section 465(c)(1)(B) states that the limitation applies to any taxpayer engaged in the activity of farming as a trade or business or for the production of income. Farming activities include the management and feeding of animals. See sec. 464(e). Section 465(b)(1)(A) provides that a taxpayer is at risk for money contributed to the activity, and section 465(b)(1)(B) and (2)(A) provide that a taxpayer is at risk for amounts borrowed for use in the activity to the extent that the taxpayer is personally liable for the repayment of such amounts. *446 An individual will be regarded as personally liable within the meaning of section 465(b)(2)(A) if he has the ultimate liability to repay the debt obligation in the event funds from the activity are not available for that purpose. Bennion v. Commissioner, 88 T.C. 684, 692 (1987); Melvin v. Commissioner, 88 T.C. 63, 70 (1987), affd. 894 F.2d 1072 (9th Cir. 1990). In making the determination of whether a taxpayer is ultimately liable to repay an indebtedness, we have stated that the critical inquiry is who, under the worst-case scenario, is the obligor of last resort. Krause v. Commissioner, 92 T.C. 1003, 1017 (1989); Melvin v. Commissioner, supra at 75. In determining which investors are ultimately financially responsible for the debt obligations, the substance of the transaction controls. Krause v. Commissioner, supra at 1017; Levy v. Commissioner, 91 T.C. 838, 863 (1988); Melvin v. Commisisoner, supra at 75. Section 465(b)(4) provides that, even though investors nominally may be personally liable with respect *447 to debt obligations, for tax purposes they will not be considered at risk with respect thereto if their ultimate liability is protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." The language "other similar arrangements" is not specifically defined in the Code or in the legislative history, but the legislative history evidences concern with situations in which investors are effectively immunized from any realistic possibility of suffering an economic loss even though the underlying transaction is unprofitable. Krause v. Commissioner, supra at 1018; Levy v. Commissioner, supra at 863-864. Where a taxpayer's obligation constitutes only a secondary liability with a right of reimbursement against the primary obligor, he will not be regarded as at risk with respect to such obligation. Melvin v. Commissioner, supra at 71. In this situation, the taxpayer's ability to seek reimbursement from the primary obligor is regarded as a form of "protection against loss" within the meaning of section 465(b)(4). Melvin v. Commissioner, supra at 71; *448 Brand v. Commissioner, 81 T.C. 821, 828 (1983). Petitioners argue that, pursuant to the Guaranty, Dr. Tepper was personally liable for the repayment of a bank loan to the extent of $ 30,000 and that he was not effectively protected from loss under any applicable arrangement. They conclude that Dr. Tepper was at risk with respect to the $ 30,000 and, accordingly, that they are entitled to deduct the partnership losses from ICS-I claimed on their 1978 and 1979 income tax returns. Respondent argues that Dr. Tepper is not at risk with respect to the $ 30,000 because he, as a guarantor of partnership indebtedness, was protected against loss within the meaning of section 465(b)(4). The language and substance of the Guaranty suggest that it was intended to make Dr. Tepper a guarantor and not to make him primarily liable. The document is styled "Guaranty" and refers to the signatory as the "guarantor" and the obligation as a "guaranty". The Guaranty provides that the bank could resort to the guarantor for payment if it had resorted to property securing the liability and concurrently proceeded against the general partner. Other documents support a finding that the *449 Guaranty was intended to place Dr. Tepper in the position of guarantor. The prospectus states that financing was expected to be either recourse or nonrecourse. No partner, general or limited, would be personally liable for nonrecourse financing and the general partner would be ultimately liable for recourse financing. It is apparent that under neither type of financing was a limited partner intended to be personally liable. The partnership agreement follows the design of the prospectus by providing that the general partner would be liable for the liabilities of the partnership and that a limited partner would not be personally liable for any debts or obligations of the partnership beyond the amount of his capital contribution and share of undistributed profits. There is no provision requiring a limited partner to make an additional contribution to capital. The Guaranty provides that it be construed in accordance with and governed by the laws of the State of Illinois. In addition, under common law, a guaranty agreement is governed by the law of the State where it was executed unless performance is intended to take place elsewhere. See Equitable Trust Co. v. Bratwursthaus Management Corp., 514 F.2d 565, 567 (4th Cir. 1975). *450 Under Illinois law, a guaranty is an enforceable undertaking or promise on the part of one person which is collateral to a primary or principal obligation on the part of another and binds the obligor to perform in event of nonperformance by such other, the latter being bound to perform primarily. Rock Island Bank & Trust Co. v. Stauduhar, 59 Ill. App. 3d 892, 375 N.E.2d 1383, 1389, 17 Ill. Dec. 99 (1978). A guarantor has a remedy against the primary obligor to recover any amounts he has to pay to the creditor. Putnam v. Commissioner, 352 U.S. 82, 85, 1 L. Ed. 2d 144, 77 S. Ct. 175 (1956). In signing the Guaranty, Dr. Tepper has in no way relinquished his right to be reimbursed by the primary obligor, the partnership, or the general partner who is first liable for unpaid partnership debts, and neither was such a waiver included in the limited partnership agreement. Even if Dr. Tepper were considered personally liable pursuant to the Guaranty, through his right of reimbursement he is protected against loss within the meaning of section 465(b)(4) and, therefore, is not at risk for the $ 30,000. See Brand v. Commissioner, 81 T.C. 821, 828 (1983). Petitioners *451 argue that the terminology of the Guaranty does not create a presumption that the limited partner is a guarantor and therefore only secondarily liable. They argue that this Court has held that a limited partner-guarantor may be personally liable for partnership debt for purposes of section 465 regardless of whether such liability is cast in the form of a guaranty. Petitioners rely on Bennion v. Commissioner, 88 T.C. 684 (1987), Gefen v. Commissioner, 87 T.C. 1471 (1986), and Abramson v. Commissioner, 86 T.C. 360 (1986). These cases are distinguishable on their facts from the instant case. In Bennion v. Commissioner, supra, we determined that a joint venture, of which the taxpayer was a member, had primary and ultimate liability on a loan it had assumed. We concluded that if the bank chose to sue parties other than the joint venture, the other parties would have a right of reimbursement against the individual members of the joint venture and that the taxpayer, as a member of the joint venture, had primary liability for his pro rata share of the assumed liability. Under the facts here present, *452 if a lender looked to the general partner or the limited partnership for payment of the partnership obligation, the general partner or limited partnership would have no right of reimbursement against Dr. Tepper. Rather, if Dr. Tepper were called upon to pay the obligation he would have a right of reimbursement against the limited partnership. In Gefen v. Commissioner, supra, as a condition for admission to the limited partnership, the taxpayer was required to and did execute a limited partner guarantee. Pursuant to the guarantee, the taxpayer assumed personal liability for repayment of her pro rata share of the partnership indebtedness. Based on these facts, we found that the taxpayer had no right of reimbursement against either the partnership or the general partner for amounts paid pursuant to her guarantee agreement and, therefore, that she was not a mere guarantor but was ultimately liable for her share of the debt. There was no primary obligor against whom the taxpayer had a remedy. The facts of Gefen v. Commissioner, supra, differ substantially from those presently before us. Under the facts in this case, Dr. Tepper was not *453 required to execute the Guaranty as a condition for admission into ICS-I. Under the Guaranty, Dr. Tepper did not assume personal liability for repayment of his pro rata share of the partnership indebtedness, but rather guaranteed, up to $ 30,000, payment of partnership indebtedness. There was no requirement in the partnership agreement for additional capital contributions from the limited partners if the assets of the partnership were insufficient to repay an indebtedness. Neither the partnership agreement nor the guaranty agreement contained any provision stating that Dr. Tepper had no right of reimbursement against either the partnership or the general partner for amounts paid pursuant to the Guaranty, and the facts indicate that he did have such right. In Abramson v. Commissioner, supra, we concluded that the taxpayer's obligation was undertaken pursuant to the private placement memorandum, which required execution of an agreement under which each limited partner assumed personal liability for a portion of the partnership indebtedness. We also concluded that the taxpayer had established that the agreements were intended to make each partner, general *454 or limited, personally liable for a specific portion of the debt, rather than making the partners guarantors. We held that each partner was primarily liable on the portion of the debt he guaranteed and that there was no primary obligor against whom he had a right of subrogation. The facts before us differ from those of Abramson v. Commissioner, supra. In this case, the prospectus and the partnership agreement both state that the limited partners would incur no personal liability for a partnership obligation beyond their initial contribution. Here the document styled "Guaranty" was not to have the effect of an assumption of personal liability but merely the effect of a traditional guaranty. Petitioners make a number of arguments based on various provisions of the partnership agreement that Dr. Tepper was personally liable for a portion of the partnership debt under his guaranty agreement. We have considered the various arguments and find them without merit. No personal liability is placed on Dr. Tepper by the partnership agreement beyond his initial contribution to the ICS-I partnership. Petitioners argue that Dr. Tepper was personally liable for the *455 repayment of a bank loan to ICS-II to the extent of $ 25,000 pursuant to his Assumption agreement. Petitioners contend that Dr. Tepper was at risk with respect to $ 25,000 since he was personally liable to that extent and therefore entitled to deduct partnership losses from ICS-II as shown on their 1979 and 1980 income tax returns. Respondent argues that the record contains no document setting forth the terms of a loan between the general partner and any lender to which the Assumption agreement could apply. While no loan documents were introduced into evidence at the time of trial, the parties stipulated that a loan was negotiated between ICS-II and FNBT. As a condition to obtaining such loan, FNBT required that some of the limited partners of ICS-II personally assume a portion of the partnership's indebtedness. Correspondence from the vice president of FNBT's Agriculture Division and the senior vice president of FNBT make it clear that a loan was made from FNBT to the partnership on December 14, 1981, and that the Assumption agreements were executed and delivered to FNBT in satisfaction of FNBT's condition to granting the loan. Accordingly, we find that a loan was made by FNBT *456 to ICS-II and that the Assumption agreements were transferred to FNBT as security for the loan. In determining if Dr. Tepper is ultimately liable for repayment of a portion of the loan, we have looked to the "worst-case scenario" since we have stated that the critical inquiry is who, under the worst-case scenario, is the obligor of last resort. Melvin v. Commissioner, 88 T.C. at 75. Under the worst-case scenario, the assets of the partnership would be insufficient to satisfy the loan obligation and the general partner would be unable to repay the loan. In addition, if the general partner were called upon to and did pay the obligation, the general partner could seek reimbursement from Dr. Tepper. Pursuant to the terms of the Assumption agreement, Dr. Tepper is the obligor of last resort and is personally liable on the loan up to $ 25,000. Respondent argues that the Assumption agreement was not a bona fide document. While execution of an Assumption agreement may have been optional with respect to admittance into the partnership, some limited partners' executing such agreements was a condition placed by FNBT for making a loan to ICS-II. Executed Assumption *457 agreements were accepted by FNBT in satisfaction of this requirement that some of the limited partners assume personal liability for the ICS-II loan. The conditions set by FNBT for the loan and the satisfaction of those conditions were pursuant to arm's-length negotiations. Accordingly, we do not question the validity of the Assumption agreements between the partnership and FNBT. Respondent argues that the Assumption agreement was intended to be a guaranty and that the liability of any partner executing an Assumption agreement would be that of a guarantor. In support of his argument, respondent refers to language of the prospectus which sets out the opportunity of the limited partners to become at risk for an additional amount by guaranteeing partnership loans. We do not find this argument persuasive. The prospectus speaks only in general terms and these general terms do not alter the specific terms of the document signed by Dr. Tepper. On its face, the Assumption agreement states that Dr. Tepper assumed personal liability. By the terms of the document, the liability of the signatory was that of a primary obligor. Dr. Tepper agreed to "pay and to assume primary and personal *458 liability for the prompt payment when due of any and all liability or indebtedness of the Partnership." Dr. Tepper's obligation was an "absolute, unconditional and continuing assumption of primary and personal liability for payment of the indebtedness." If called upon to pay a liability of the partnership, Dr. Tepper was not entitled "by contribution, indemnification, subrogation or otherwise to any payment by any other person, including the general partner." In addition, if the general partner were called upon to and did pay the debt, the general partner could seek reimbursement from Dr. Tepper up to the amount that Dr. Tepper assumed. Respondent argues that the correspondence from FNBT indicates that the limited partners would only be secondarily liable and therefore that the Assumption agreements were intended to be guarantys, placing partners executing the agreements in the position of guarantors. Correspondence from FNBT states that, if the loan had not been repaid by the partnership or the general partner, it would have secured recovery from limited partners who had signed Assumption agreements. The liability of the limited partners is secondary only in the sense that FNBT *459 would have looked to the partnership or general partner first for repayment of the loan and the limited partners second. But this sequence was not required pursuant to the Assumption agreement, and the order in which FNBT would choose to proceed for repayment of the loan does not transform assumptions of personal liability into guarantees. The Assumption agreement states that "The Lender shall not be required, before enforcing the liability of the undersigned hereunder, to exhaust its remedies against the Partnership or any other person liable on the Indebtedness, including any partner of the Partnership, General or Limited, or attempt to collect on or resort to any security for the Indebtedness." That the partnership or the general partner remains in the "chain of liability" does not detract from the fact that a limited partner who executes an Assumption agreement has ultimate liability. The substance of the Assumption agreement controls. See Melvin v. Commissioner, supra at 75. Respondent next argues that the limited partner's obligation would arise only if the loan were not paid by the partnership and that, at the time the loan was negotiated, the partnership's *460 assets were sufficient to secure the loan amounts. He concludes that the possibility of Dr. Tepper's being called upon to pay the loan is remote, that the substance of the transaction is that of a guarantor, and that the form of the Assumption agreement as an assumption of personal liability should be disregarded. The fact of Dr. Tepper's ultimate personal liability is not changed by the remoteness of the possibility of the debt's not being satisfied by the assets of the partnership. The remoteness of being called upon to satisfy a liability neither transforms a personal liability into a guaranty nor requires a finding that the substance of a transaction differs from the form. The test is who, under the worst-case scenario, has ultimate liability. See Melvin v. Commissioner, supra at 75. Respondent argues that, because the prospectus emphasizes the tax benefits of executing an Assumption agreement, the Assumption agreements were merely a device for avoiding the application of section 465. The fact that a limited partner who executed an Assumption agreement may have realized tax benefits from an increase in his amount at risk does not alter the substance *461 of the transaction or the meaning of the documents or change the fact that he was ultimately and personally liable for repayment of the loan. The existence of tax benefits does not of itself deprive a transaction or event of economic substance. Frank Lyon Co. v. United States, 435 U.S. 561, 581, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978); Gefen v. Commissioner, 87 T.C. 1471, 1490 (1986); Estate of Thomas v. Commissioner, 84 T.C. 412, 432 (1985). An investor is free to structure a transaction so as to take advantage of favorable tax consequences. Petitioners argue that Dr. Tepper would not be protected against loss through a right of reimbursement. We agree. Dr. Tepper waived his right of reimbursement under the terms of the Assumption agreement. He was not otherwise protected against loss. Accordingly, Dr. Tepper was at risk for $ 25,000 of the loan to ICS-II pursuant to the Assumption agreement. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩